LittletoN, Judge,
delivered the opinion of the court:
Plaintiff claims that on August 9, 1921, the United States through the Shipping Board unconditionally accepted its *455 bid for 268 wooden ships with machinery, equipment, spare-parts, and supplies, as amended by its bid of August 5, 1921, and that such bid and such alleged actions constituted a legal and binding contract between the parties which it is alleged the defendant breached between August 9 and September 27, 1921, by refusing to deliver the ships in accordance with the terms.and conditions of the bid as amended. Whether there was a legal and binding contract between the parties constitutes the first and principal question in plaintiff’s case.
Plaintiff computes its claim as follows:
Alleged fair market value of— 100 ships for operation at $13,000 each_$1, 300, OOO
168 ships for dismantling, $10,500 each-■_ 1, 764, OOO
3,064, OOO
168/200ths of $900,000, the alleged fair market value of equipment, spare parts, and supplies belonging to the ships stored for safekeeping when the ships were laid up and not put on the ships to be dismantled_ 756, 000
Expenses for attorneys, engineers, officers’ expense, and expenses of making preparations to perform incurred between August 9 and September 27, 1921_ 10, 000
Interest on $10,000 from September 27, 1921_ 10, 000
3, 840, 000
Less: Contract price-$562,800
Alleged repairs to 100 ships having an alleged market value for operation of_ 78, 902
- 641,702
3,198,298
The essential facts as established by the record are set forth in the findings. Plaintiff bases its claim for the amount above stated solely on the contention that the Shipping Board on August 9, 1921, adopted the resolution embodied in the document furnished to plaintiff by the secretary of the Shipping Board on August 12, 1921, which is set forth in finding 4, and that its bid and this resolution, which plaintiff contends was an unconditional acceptance by the board, constituted a legal and binding contract. We are of opinion that this contention is not sustained by the *456 record. As a general rule when a written offer on specific terms and conditions is made and the terms and conditions proposed therein are accepted without further conditions, and, upon the basis of such action, nothing further remains to be done, except the signing of a formal contract embodying such terms and conditions, there exists a valid contract between the parties in the absence of a statute or regulation imposing further requirements. It is further the general rule that if parties dealing with each other with the view of arriving at a contract intend that their negotiations shall be finally reduced to writing and signed by them as evidence of the terms and conditions of the agreement, there exists no binding contract until the written contract setting forth such terms and conditions is executed. The fact that, as in the case at bar, a representative of the government or the governmental agency mistakenly and without authority incorrectly advises the other party, or the bidder, that its proposition or bid has been accepted by the government, or such governmental contracting agency, does not bind the government, and such action gives the other party no rights in the premises to any greater degree than exist upon the basis of the action which was actually taken by the agency or board possessing the authority to fix the terms and conditions upon which the government shall be bound. Cases to this effect are uniform and the proposition mentioned is so'well established as not to require citation of authority. It is also an established proposition that estoppel cannot be set up against the government on the basis of an unauthorized representation or act of an officer or employee who is without authority in his individual capacity to bind the government.
The Shipping Board, which was the agency authorized by statute to act for the United States in the sale of the wooden fleet at private or public competitive sale, was composed of seven members. The evidence clearly shows that after the bids were opened on July 30, 1921, the board without acting upon any of the bids or upon the general question of the sale of ships or the terms and conditions upon which they would be sold directed one of' the commissioners of the board and the assistant to the chairman of the board to *457 investigate and consider the terms and conditions of the bids in connection with the information and data disclosed by the records of the Emergency Fleet Corporation, all of which were in possession of the board. The Shipping-Board, as such, did not consider or take any action with reference to the general question as to the sale of the wooden ships or with reference to plaintiff’s bid until August 9, 1921. In the meantime the plaintiff, who was the highest bidder for the largest number of ships, submitted to the Board on August 5, 1921, an amended bid in which certain of the terms and conditions of the original bid were modified. At a meeting of the board, at which six commissioners were present, the question of sale of the wooden ships in connection with plaintiff’s bid was taken up by the board for consideration. At this meeting, as the record discloses, the outstanding questions before the board, and which it then took under consideration, were, in substance: first, should the board at that time authorize and proceed with the sale of the wooden fleet; second, should the board then proceed to take definite and final action to bind the United States on a sale of the fleet; and, third, should it fix and finally act upon the terms and conditions upon which a stated number of ships and/or equipment would be sold to plaintiff under its bid. There was a great deal of discussion with reference to these matters by the board. The meeting of the board at which these questions were considered and discussed lasted from 9 to 11:15 a. m., and from 1:15 to 4:20 p. m. During the course of the general discussion with reference to these matters it was suggested by a member of the board that a resolution indicating the action which the board desired to take be prepared; however, the board did not direct that this be done and the discussion continued. Commissioner Plummer was not always present in the board room; he was frequently called out, because of other duties, and he was absent from the meeting during much of the discussion of matters by the board. Later, during the meeting, Commissioner Plummer drafted a proposed resolution substantially in accordance with the document subsequently prepared and delivered to plaintiff on August 12, 1921, as set forth in finding 4, but *458 this resolution was not acted upon or approved by tbe board as drawn. No special consideration was.given specifically to it and no direct action was taken solely upon it by the board, and the discussion continued. The findings set forth the nature and extent of the action finally taken by the board with reference to plaintiff’s bid and the questions considered in connection therewith. These findings show that the board did not, and certainly not without conditions and limitations, adopt a resolution or take any action specifically accepting the terms and conditions of plaintiff’s bid; and, that the board did not adopt any resolution in the language of the purported resolution delivered to plaintiff and upon which it relies as constituting, with the bid of August 5, 1921, a valid and binding contract between the parties.
With reference to the nature of the action taken by the board at the meeting on August 9,1921, A. D. Lasker, chairman of the board, testified in part as follows:
The matter, if I remember now, came up at a subsequent meeting [August 9, 1921], with a resolution prepared by Mr. Plummer authorizing the sale. We had a general conversation of a very general nature, and I remember distinctly, and in this my memory is clear, that I said before I would vote for any final sale I wanted to submit the matter to the President. I had not been long in office. I didn’t know exactly how far my powers went. I didn’t know what the background of this thing was, and maybe he might want to submit ifc to the Congress. And I remember someone — I forget whom — there were a lot of loose tail ends; and after a long rambling discussion, it was' decided we would take a vote on the resolution based, however, on the loose ends being tied up, and my submitting it to the President. The whole meeting was informal. * * *.
Q. Was that resolution, Mr. Lasker, acted upon at that meeting?
A. Informally only, and with conditions surrounding it that gave no man the right to say that Board had authorized a sale. I refer to that because two or three days later, on the Mayflower, when I saw in the Washington Post an. account, of the sale, I expressed to the President my utter surprise and indignation and discouragement that such a thing could happen.
*459 Commissioner Lissner of tbe Shipping Board testified in part as follows:
Q. I show you paper marked plaintiff’s exhibit No. 3, purporting to be a resolution, alleged to have been passed by the United States Shipping Board on that date. Will you state whether or not that resolution was passed on that date?
A. According to my understanding, it was not.
Q. Will you please state what did take place at that meeting with reference to that subject-matter?
A. We were discussing the bids that had been received for the sale of the wooden fleet and what the policy of the Board should be, what action we should take in regard thereto. There was a good deal of discussion lasting a long time. During the course of that discussion the suggestion was made and generally approved that we should take a tentative vote upon the high bid, which is the discussion in this case, but that the vote would only be tentative, and that any action that we would take upon the matter would be subject to the approval of the President and Congress. That was my understanding of what we did. And later on, when I voted on this matter, I understood that I was voting simply on a tentative proposition with the'limitations that Í expressed.
Q. Did you understand that the terms of that bid were definitely acceptable to the Board ?
A. I did not.
Q. It had been threshed out or negotiated by anybody in behalf of the Board?
A. I did not understand that the matter was in definite shape at that time for final acceptance at all.
Commissioner Thompson of the board testified in part as follows:
Q. I show you a copy of the resolution which has been marked Plaintiff’s Exhibit No. 3. Will you state whether or not that resolution was passed by the Shipping Board at that meeting?
A. I am quite confident this resolution was never presented to the Board upon which I voted at any time.
Q. Will you tell us in a way — I mean, tell us what happened at that meeting, what discussion there was at that meeting with reference to the bid of the Ship Construction Company?
A. The whole question of the disposition of the wooden fleet was up. My recollection is very clear, and *460 I so contended when this matter has been discussed, that the vote taken that day was to ascertain the sentiment of the Board with respect to the disposition of the wooden fleet. Personally I had very pronounced views that there should be some Congressional authority. My recollection is distinct that the Chairman stated he wanted to discuss this matter with the President. There was considerable discussion, and I am not usually given to being misled at Board meetings, and I said “I want to duck under the table.”
Q. Wanted what?
A. To duck under the table. It was a tiling that greatly worried the Board, as to what disposition to make of the wooden fleet. A resolution had been introduced in Congress, I think, directing us to dispose of the wooden fleet by October 1. I felt that it was too serious a matter to hasten on, and I am quite assured that the vote taken that day was merely to test the sentiment of the Board as to how they felt as to the disposition of the wooden fleet.
I will say this, that had it been a direct question upon a resolution, I would most certainly have voted no.
Commissioner Chamberlain testified in part as follows:
Q. I show you what purports to be a resolution of the Shipping Board. Will you state whether or not that resolution was passed at that meeting?
A. The resolution, as I recall, was passed by the board at that meeting as a tentative proposition and in connection with the general discussion which was had.
Q. What am I to understand by that statement, Senator? Do you mean that particular resolution, without any qualifications, was passed?
A. No; the resolution was read by Mr. Plummer, and after this discussion, which had extended over several hours — I do not remember how many — it was passed as a part of the general discussion in connection with the disposition of wooden ships; and I think the minutes would have been proper if, in the preparation of them, they had stated that the resolution was only to become effective if the financial standing of these gentlemen was good, if the President approved and if the matter could be submitted in Congress, in some way, by resolution or otherwise. In other words, the resolution was a part of the whole general scheme with reference to the disposition of wooden vessels. That is the way I understand it. I did not understand that the resolu *461 tion would be effective except on tbe conditions which were discussed and which I have named.
Q. What other things, if any, were to be fixed up, that you recall, or to be made certain as a part of that?
A. This bid, as I understand it, was made by this company upon an advertisement which called for the sale of the ships “as is, where is, and what is.” It was discovered, because there had been no due appraisement, as I understand the term, that there was an immense amount of property that had been taken off the ships and was stored in different warehouses and other places. All of this had to be adjusted before the final contract of sale was entered into. Those were some of the things that Mr. Farley spoke of in his statement which has appeared here. All of that was to be adjusted as a part of the sale of these ships and the terms to be embodied in the contract, as I understood it.
Commissioner O’Connor testified in part as follows:
Q. Will you state whether or not the resolution was passed on that day at that meeting?
A. I would say not, the way it is drawn up in the paper.
Q,. Will you tell the court what your understanding is of what happened at that meeting?
A. If I understand it rightly, the motion that was passed was to give the Committee power to trade. After several hours of negotiations they were then given power to trade.
The above testimony of the five commissioners, which is not contradicted by any evidence in the record, shows clearly that the action of the board was not an approval or adoption of a resolution unconditionally accepting plaintiff’s bid in the language of the document which was later prepared by the secretary of the board and delivered to plaintiff on August 12, 1921.
Commissioner Plummer, who during the course of the meeting of the board on August 9, 1921, had prepared a proposed resolution substantially in accordance with the document later delivered to plaintiff on August 12, testified with reference to the matter in part as follows:
Q. Did you have a meeting of the board on August 9th after you had in the July 30th bid and the amendment of August 5th?
*462 A. Yes, sir.
Q. Mr. Plummer, did you introduce a resolution in that meeting of August 9th, accepting the bid as amended of the Ship Construction & Trading Company?
A. I offered such a resolution.
Q. May I ask you if this is a copy of the resolutions which you then offered?
A. I should say it was.
Q. Mr. Plummer, were you present during all of that meeting of August 9th?
A. I can’t say. At that time I had no secretary and so I was in and out a good deal.
Q. Were you present during a discussion of the Ship Construction & Trading Company’s bid at that August 9th meeting ?
A. Well, now, I cannot say.
Q. Mr. Plummer, was that resolution passed on that day by the board?
A. I so understood. I learned that some of my colleagues disagreed with me later.
In view of the foregoing and upon the facts as set forth in the findings, we hold that no legal and binding contract resulted from plaintiff’s bid and the action which was actually taken by the board at its meeting of August 9, 1921. Where one authorized to do so receives and accepts a bid and awards a contract but whose action with reference to the contract to be executed between the parties is subject to approval by another and that approval is not subsequently given, no binding contract exists on which the United States may be required to respond in damages as for a breach. Monroe v. United States, 184 U. S. 524; Cathell et al. v. United States, 46 C. Cls. 368; Horton v. United States, 57 C. Cls. 395; Jacob Reed’s Sons Inc. v. United States, 60 C. Cls. 97; Burney Axe, Trading as B. Axe & Co. v. United States, 60 C. Cls. 493; American Electric Co. v. United States, 60 C. Cls. 993.
The record shows that the Shipping Board did not at any time subsequent to August 9, 1921, take any action which would constitute the making of a contract with plaintiff, either on the terms of plaintiff’s bid or on any other definite terms.
*463 In view of our conclusion that there was no contract between the parties upon which a suit for damages could be based, it is unnecessary to discuss in detail the contentions of plaintiff with reference to the number of ships, etc., to which it alleges it was entitled and the fair market value thereof and, also, the contention of plaintiff that the board had duly and properly made an appraisal of the ships as required by the act of June 5, 1920. We have studied the record in this regard and carefully considered plaintiff’s contentions and our decision as to the facts established by the record with reference thereto is disclosed in the facts set forth in findings 5 and 11. Plaintiff’s contentions with reference to market value are not established by any substantial and convincing evidence with reference, either to the value of the ships for dismantling or for probable profitable operation. The record shows that in September 1920 there was a complete collapse of the shipping industry and that thereafter and during 1921 there was no market for wooden ships for the purpose of operation and that the cost of maintaining and operating them would, in all probability, equal or exceed any earnings therefrom. But in addition to this the record establishes that 235 ships of the 268 on which plaintiff bid, and which constitute the subject matter of this suit, were sold to one George D. Perry in 1922 and 1923 for dismantling at an average price of $3,318.58 and that the purchaser sustained a loss of $281,098.80 on the undertaking, or an average loss of $1,196.16 a ship. This, we think, is the best evidence of the fair market value of the fleet as a whole. On this evidence the fair value of the ships was not in excess of $2,122.42 each. Plaintiffs testimony with reference to the matter of profitable operation of some of the ships on which it bid is conjectural and based on estimates not supported by any substantial or convincing facts.
With reference to the matter as to whether an appraisement of the ships had been made, as required by the statute, the record shows that when this matter was taken up by the Shipping Board for consideration it decided upon the basis of all the documents and facts upon which plaintiff relies* *464 and upon the basis of advice of its counsel, as well- as upon legal advice obtained by the board from outside sources, that the board had not made, or had made for it, any ap-praisement of the ships as required by the statute. Upon the record we certainly are not justified in overruling this considered action of the board. In addition, the evidence shows that when the matter as to whether the board had made a proper appraisal of the ships came up the board did not desire to terminate its negotiations with plaintiff' in an effort to arrive at a contract of sale and that its action on September 27, 1921, in which it terminated the negotiations and declined to enter into any contracts with the plaintiff, was reluctantly taken.
This leaves for consideration the question whether the defendant is entitled to maintain and to recover on its counterclaim. The principal amount due the defendant by plaintiff is stipulated to be $299,918.27, on which defendant also-claims interest. In view of the facts set forth in the findings we think an extended discussion as to whether the defendant owns the counterclaim and may legally assert it and whether it is barred by the statute of limitation is not necessary. The fact that the contract, under which the overpayment made the subject of the counterclaim, was entered into with plaintiff by the Fleet Corporation in its corporate capacity does not, in the circumstances disclosed by the record, preclude the defendant from maintaining its countersuit. Crane et al. v. United States, 73 C. Cls. 677, 684-5, 689. Nor does the fact that the contract did not state that the Fleet Corporation was representing or acting as the agent for the United States preclude recovery. The Fleet Corporation was created by the United States through the Shipping Board for the purpose of providing ships desired and needed by the United States. The Fleet Corporation was owned, and its every action controlled, by the government. Officers and directors of the Fleet Corporation were composed of officers and employees of the Shipping Board and all the transactions by the Fleet Corporation, including those out of which this overpayment grew, were financed by the United States from public funds authorized and ap *465 propriated by Congress. Moreover, the contract of November 22, 1917, in the performance of which this overpayment of $299,918.27 was made, was entered into, and executed after the President of the United States, pursuant to law, had delegated to the Fleet Corporation all the powers vested in him and had ratified and confirmed all the acts and transactions of the Fleet Corporation. We need not consider whether, if the claim asserted by the defendant in its countersuit had remained in the hands of the Fleet Corporation beyond the general statutory period of limitation for bringing suit, that such' limitation statute would bar recovery by the defendant. The provisions of the Merchant Marine Act of 1920 transferred this claim to the Shipping Board and since the cause of action on the overpayment did not accrue until July 28, 1919, it-is clear' that the same was not barred on June 5, 1920. It is likewise clear that the right of the United States to sue upon the claim is not barred for the reason that the statute of limitation did not run against the United States after June 5, Í920.
The United States is entitled to recover interest. Billings v. United States, 232 U. S. 261. In the Seventh Article of the contract of November 22, 1917, plaintiff agreed to repay to the Fleet Corporation any overpayment that the Fleet Corporation might make in paying all the expenses of completing the hulls under the terms of that contract. Plaintiff’s shipyards, which in the meantime had been taken over by the Fleet Corporation, were turned back to plaintiff July 28,1919, and the hulls were accepted by the United States in October. The Fleet Corporation stated an account in the matter on February 28, 1922, and delivered the same to plaintiff and demanded payment of the balance shown to be due the Fleet Corporation on March 18, 1922. On that date interest in favor of the creditor commenced to accrue. See Enright & Fletcher v. United States, 73 C. Cls. 416. The amount of interest at 6 percent per annum to which the defendant is entitled on. the principal amount due by plaintiff from March 18,1922, to April 1,1940, the date of judgment, is $324,561.62. The defendant is therefore entitled to recover $624,479.89. Judgment will be entered accordingly. It is so ordered.
*466 GeeeN, Judge; and Whaley, Chief Justice, concur.
WHITAKER, Judge; and Williams, Judge, took no part in the decision of this case.