Lucille B. **WOODBURY**, Executrix of the Estate of Ray B. Woodbury, Deceased,

v.

The **UNITED STATES**.

No. 127–61.

United States Court of Claims.

July 15, 1966.

Norman J. Wiener, Portland, Or., attorney of record, for plaintiff. King, Miller, Anderson, Nash & Yerke, Portland, Or., of counsel.

Gerson B. Kramer, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant. Manfred J. Schmidt, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DAVIS, Judge.

This suit is for breach of an alleged contract with the Housing and Home Finance Agency (HHFA), formerly an independent agency of the United States (now merged into the Department of Housing and Urban Development). Plaintiff [1] charges that in April 1954 HHFA became party to an agreement to facilitate the completion of a housing project in Kodiak, Alaska; that the United States thereby assumed a contractual obligation either to implement and carry out the existing federally-supported arrangements for long-term financing or to provide alternative means for such financing; and that defendant thereafter breached this agreement to plaintiff's detriment. The Government denies each of these allegations, disavowing all the elements of the liability charged. In addition, it has lodged counterclaims seeking recovery for asserted breaches of guaranty by plaintiff. The parties have filed cross-motions for summary judgment on the plaintiff's claim; defendant also seeks summary judgment on one of its counterclaims, and plaintiff opposes that request, asking for dismissal of both counterclaims.

This action is one phase of a complicated round of litigation between these

---

1. Ray B. Woodbury, the original plaintiff, died on September 6, 1964. His widow, as his executrix, has been substituted as plaintiff. "Plaintiff" is used in this opinion to refer to Mr. Woodbury, who actively participated in the transactions from which the claim arises.

same parties in three federal courts.[2] For that reason, we set out in considerable detail both the facts giving rise to the plaintiff's present claim and the pertinent aspects of the proceedings in the other courts.

## I

Beginning in 1949, various officials representing the Navy, the Alaska Housing Authority, the City of Kodiak, Alaska, and the Federal Housing Administration (FHA) discussed the possibility of obtaining additional housing for naval and civilian personnel connected with the Kodiak Naval Base. After considering possible approaches, the responsible officials decided to plan for the construction of an off-base project of some 350–400 dwellings, utilizing FHA's power to insure conventional mortgages on individual houses (Title II, § 203 of the National Housing Act of 1934, 12 U.S.C. § 1709). During 1951, plaintiff became interested in sponsoring the planned project at Kodiak. In February 1952, he incorporated Aleutian Homes, Inc. (in Oregon) for the purpose of sponsoring the housing project, and soon the City of Kodiak approved Aleutian as the sponsor of the naval base project.[3] The Alaska Housing Authority then conveyed the land selected for the site to the plaintiff's corporation.

Under the FHA § 203 mortgage insurance program, private mortgage companies must take out individual long-term mortgages on each house in the project. To obtain this required permanent financing for its proposed project, Aleutian executed an agreement with Brice Mortgage Company (Brice), a mortgage-brokerage firm. To interest buyers for the individual mortgages, which would be sold, it was then necessary for Brice to have a commitment from FHA to insure them. To this end, the mortgage firm, acting for Aleutian Homes, took the steps required by the FHA regulations to arrange for the insurance. The Navy certified to FHA the urgent need for housing at the Kodiak Naval Base, the permanency of the Base, and the ability of the military and civilian personnel stationed there to pay the planned monthly rentals. FHA appraised the value of the proposed 344-unit project at $5,904,250.00 and, in April 1952, issued for a stated period its conditional commitment to Brice to insure long-range individual mortgages on each home in a total amount of $4,706,-400.00 (80% of the FHA-appraised value.) Furthermore, the Federal National Mortgage Association (FNMA), which provides a secondary market for the purchase and discounting of mortgages, gave its commitment to Brice to purchase at par the individual long-term mortgages as they were obtained by Brice and insured by FHA.[4]

The next step for Aleutian was to find funds for carrying out the construction work itself. It proved impossible to elicit construction financing from private sources, and assistance was then sought from HHFA. An application was made, late in 1952, by Aleutian, acting through Brice, and this was approved in January 1953. This interim construction loan by HHFA was for $4,230,-900.00, which constituted 90% of the FHA and FNMA commitments with respect to the permanent long-term financ-

2. The related decisions are Woodbury v. United States, 192 F.Supp. 924 (D.Or. 1961), aff'd, 313 F.2d 291 (C.A.9, 1963); Woodbury v. United States, 232 F.Supp. 49 (D.Or.1964), aff'd in part, rev'd in part, vacated in part, United States v. Woodbury, 359 F.2d 370 (C.A.9, 1966). Our statement of the facts draws upon these decisions (especially 313 F.2d 291).

3. Plaintiff's petition alleged that he owned 799 of the 800 outstanding shares of stock in Aleutian Homes, Inc.

4. The $4,706,400.00 to be received from the long-term financing was to be used by Aleutian Homes, Inc. for (i) repayment of the interim, short-term construction loan which was subsequently to be negotiated with HHFA for $4,230,900.00; (ii) payment of costs of taking out the permanent mortgages on the individual homes; and (iii) capital, to the extent of any balance remaining.

ing of the individual homes. The interim loan application indicated that the difference between the projected construction costs and the amount of the loan sought from HHFA would be provided by the sponsor, Aleutian. On this basis, the HHFA loan was authorized by a Loan Authorization signed by the Agency Administrator, and carried into effect on April 27, 1953, by a Building Loan Agreement and certain associated documents, including a guaranty by plaintiff of the Loan Agreement and a promissory note in the total amount of the approved loan. This short-term note was repayable on or before December 31, 1953, and was secured by a deed of trust. Procedures for HHFA's disbursement of the funds under this loan were provided in a separate agreement executed by Mr. Woodbury as President of Aleutian.

Contracts for constructing the project were also signed on April 27, 1953. Aleutian, as the owner, entered into a "general contract" with Kodiak Construction Company (a corporation organized and substantially owned by Mr. Woodbury) for the construction of the project in return for payment of $4,230,900.00 (the total maximum amount of the HHFA loan). Since Kodiak had little actual construction experience, it, as the general contractor, subcontracted with three experienced builders for preparation of the site and erection of the homes, as well as with a freight company. The total payment under these subcontracts, plus freight, was $4,230,900.00 (again, the maximum total amount of the HHFA loan).

During the summer of 1953, certain difficulties cropped up in the preparation of the site, and a dispute developed between Kodiak Construction and Pacific Alaska Contractors, Inc., the subcontractor engaged in the site work. In August, Pacific Alaska ceased work and Kodiak assumed performance of that phase. The Government was not immediately informed of this change. In October and November 1953, financial uncertainties arose in connection with the construction, and, on November 6,

1953, Pacific Alaska Contractors, Inc., filed a claim of lien against the project in the amount of $150,504.43. Construction then came to a standstill, with the project only about 75% completed. Demand was made on Woodbury and Aleutian to satisfy the indebtedness and remove the lien. They failed to comply. It then became necessary to take measures to protect the financial position of both the United States and the participating creditors and lienors.

In the late fall of 1953, the various parties considered several protective courses of action, including foreclosure, completion of the project by the surety companies, and the substitution of a new sponsor for Aleutian. In January 1954, a plan for finishing the project—known as the "completion agreement"—was developed. The basic justification for this arrangement was clearly expressed in its introduction: (a) "a number of creditors of the Owner [Aleutian], the General Contractor [Kodiak] and Subcontractors have past due accounts and Lender [HHFA] is unwilling to make further disbursements on * * * [its] loan because of * * * unpaid creditors, liens filed against the Project, and other defaults under * * * [the] loan"; (b) "it is in the best interests * * * of all parties hereto and of Lender [HHFA] * * * to proceed with an early completion of the Project and * * * an early retirement of all outstanding bills, claims and liens against the project". As a result, certain named parties agreed, in consideration of their "mutual promises" and to "induce Lender [HHFA] to make and disburse further proceeds of * * * [its] loan", to accept specified amounts as full payment for all their claims and to refrain from other proceedings to satisfy these claims.

The agreement also provided for the completing of the project. To carry out this aspect, Aleutian, Kodiak Construction, and a subcontractor agreed to vest in a Project Manager exclusive authority to take all actions that the corporations would be authorized to take, subject to

certain explicit rights reserved to HHFA. Plaintiff Woodbury also consented, individually, to assume certain obligations. Finally, the agreement was conditioned on HHFA's compliance with four specific "conditions", including appropriate modification of its construction loan disbursement procedures, extension of the original maturity date of that loan (December 31, 1953), and deferral of collection of interest until completion of the project. On April 23, 1954, this "completion agreement" was executed and signed by the ten classes of "parties" named in it, including Mr. Woodbury, who signed for Aleutian, Kodiak, and as an individual. Neither the United States nor HHFA was named as a "party" to the arrangement, and defendant and its agencies were not signatories.

Under the completion agreement, a Project Manager and a Construction Superintendent were appointed. The work was completed in the fall of 1954. By April 1955, 341 of the 343 project dwellings had passed FHA's final inspection. All creditors' claims listed in stages one and two of the completion agreement were paid; some of the claims in stages three and four were satisfied. However, the private, permanent individual mortgages were not taken out on any of the 341 houses. During June 1955 the FHA commitments to insure those mortgages and the FNMA commitments to purchase them at par expired. HHFA did not act to prevent these commitments from lapsing, nor did it attempt to obtain new ones.

Under its interim construction loan, HHFA made advances to or for the benefit of Aleutian for project costs in the total amount of $4,192,717.10, of which $862,654.42 was paid after the execution of the completion agreement. Additional sums were advanced in March

1955. As of June 30, 1957, HHFA claimed due but unpaid accrued interest of $211,105.65. About June 11, 1957, HHFA commenced foreclosure proceedings in the United States District Court in Anchorage, Alaska. That suit sought to collect the balance due on the construction loan and to foreclose the interest of Aleutian, of the other unpaid creditors, and of all other parties involved in the project and its assets. On the motion of HHFA, the District Court appointed a receiver to operate the project. From June 1958 to April 1959, that court authorized the receiver to pay HHFA some $350,000.00 out of the operating proceeds. Foreclosure was ordered in April 1964, and has apparently been effected.

On September 30, 1957, after HHFA brought its foreclosure suit, Woodbury filed an action against the United States under the Federal Tort Claims Act in the District Court for Oregon. The Government counterclaimed under the False Claims Act (31 U.S.C. §§ 231–233) to recover damages and penalties for alleged frauds perpetrated by Woodbury in connection with the project.[5] The tort claim was first tried separately; no action was taken at that time on the false claim charges. Woodbury contended that through the completion agreement HHFA had become a fiduciary, not only for Aleutian and the other creditors involved in the project, but also for him individually, and that HHFA breached its duties "by refusing to adopt a permanent long-range program of amortizing the Kodiak project in a manner" which would effectuate the completion agreement. The District Court concluded that the Government was a party to the completion agreement (even though it never signed the instrument), that HHFA had an implied obligation to arrange for long-term financing, and that it breached its duty by not doing so. But it never-

5. The false claims counterclaim was filed, on October 23, 1959, as an amendment to the Government's answer in the suit brought by Woodbury.

The proceedings in the Oregon District Court were quite complicated. Since they are not all directly pertinent here, there is no need to spell them out fully. They are outlined in United States v. Woodbury, supra, 359 F.2d at 372–373.

theless held, assuming that there was such a wrong, that the breach was not the "ordinary common-law type of tort" contemplated by the Federal Tort Claims Act, and that therefore it lacked jurisdiction under that Act. It dismissed the suit without prejudice.

Woodbury appealed to the Ninth Circuit and, on April 4, 1961, also filed suit on his claim in this court under 28 U.S.C. § 1491, our version of the Tucker Act. Proceedings here were suspended awaiting the outcome of the appeal to the Court of Appeals. In January 1963, that court affirmed the District Court's decision that there was no jurisdiction under the Tort Claims Act. It assumed *arguendo* that the lower court's finding that HHFA was a party to the completion agreement was correct, but held "that where, as in this case, the action is essentially for breach of a contractual undertaking, and the liability, if any, depends wholly upon the government's alleged promise, the action must be under the Tucker Act, * * *." 313 F.2d at 296.

The parties then returned to the District Court for trial of the false claim charges. The Government contended that Woodbury was responsible, under the False Claims Act (31 U.S.C. § 231), for improper claims made on certain loan applications submitted to HHFA in the name of Aleutian and Kodiak Construction Company. The District Court found that Woodbury had knowingly violated the Act in ten instances. The court held, however, that, through the completion agreement, the Government had compromised the false claims, that it had waived the fraud (if any), that it was estopped, and that all but one of the claims were barred by limitations. In so holding, the district judge incorporated in his decision the findings (and "comments") of his earlier opinion that the Government was a party to the completion agreement and that liability may be assumed under a written contract without formal execution of it.

Cross appeals were taken to the Court of Appeals. It reversed the lower court's ruling that the false claims were barred by limitations, and held "clearly erroneous" the finding that the completion agreement was a compromise of these claims, as well as the finding of waiver and estoppel. The District Court's finding of ten violations of the False Claims Act was affirmed. In addition, and most importantly for our purposes, the Ninth Circuit held that the district judge's determination that the Government became a party to the completion agreement was *"coram non judice* because jurisdiction was not in the District Court under the Tort Claims Act but in the Court of Claims under the Tucker Act." It continued: "Woodbury's claim is still pending in the Court of Claims which is the proper forum in which to decide it. We therefore think that the [district] court's finding in this case, as it relates to that claim, should be set aside." United States v. Woodbury, supra, 359 F.2d at 380 (March 11, 1966).

■ Oral argument was had before us in June 1965. We have held the case since then, awaiting the recent decision of the Ninth Circuit. At this court's request, both parties have filed memoranda setting forth their contentions as to the effect on this proceeding of the Ninth Circuit's rulings. In this latest submission, plaintiff has abandoned the argument that the district judge's findings on the nature and effect of the completion agreement are binding on this court through res judicata, collateral estoppel, or law of the case. We agree, and conclude that the result of the Court of Appeals' vacating of the District Court's determination and findings is that we are free to decide for ourselves the issue of the Government's contract liability.

II

■ Plaintiff's fundamental contention is that defendant was a party to,

and breached, the completion agreement.[6] As we have noted, the Government was not named as a party to that arrangement and never signed it. Claimant therefore focuses on the active and central role played by HHFA representatives in the negotiations, from the fall of 1953 to April 1954, which culminated in the execution of the agreement. His position rests on the twin legal premises, unassailable when properly invoked, that (a) liability may be assumed under a written contract even though it is not signed by the party obligated (see First Nat'l Bank of Sleepy Eye v. Sleeper, 12 F.2d 228, 230 (C.A.8, 1926); Laurent v. Anderson, 70 F.2d 819, 822 (C.A.6, 1934)), and that (b) terms which are plainly implied (from the circumstances) in an agreement should be given life when they are indispensable to effect the parties' intention. See Sacramento Nav. Co. v. Salz, 273 U.S. 326, 329, 47 S. Ct. 368, 71 L.Ed. 663 (1927). Plaintiff attempts to cast the facts into that mold. The argument is that the completion agreement was formulated to vest overall control and supervision of the Kodiak project in HHFA, that the defendant assumed such powers, and that the fact of the Government's exclusive control must give rise to a contractual obligation to provide long-term financing—because that was essential to the successful conclusion of the project. We hold, on the contrary, that the agreement's terms show that the Government was not a party to the completion agreement itself, and further that, even if it were, those terms (coupled with the circumstances surrounding the agreement's adoption) indicate that the United States never assumed an obligation to furnish long-term financing.[7]

We start with the completion agreement itself—set forth at 192 F. Supp. 939–942. On its face, it is a self-contained, integrated document, apparently complete. This is important, for when businessmen reduce their purposes to a formal writing the burden of adding terms or of widening the obligation is heavy. The first hurdle is the opening sentence which unequivocally declares that it is "made and entered into * * * by and between the following parties". Then, in ten classes, the major, interested businesses and claimants are listed as the parties. The signatures of representatives of these parties appear at the end of the agreement. Neither the United States nor HHFA is included as a named party or as a party-signatory. Plaintiff would have us minimize this primary fact, but we cannot. The tenor of the entire agreement, its gist, is that it is the "parties" who, again and again, assume weighty obligations. Meticulous attention was obviously paid to the consequences of one's becoming a "party". In this context, it seems highly probable that if HHFA were to be obliged it would be so named. Nor can section 18—which states that "it is understood that either a written or oral approval of this Agreement will be obtained" from HHFA, if possible—aid plaintiff. That clause refers to the Agency only in its capacity as a creditor whose acquiescence was necessary to bring the agreement to functioning life but who was not to be a party. The same section explicitly recognizes that the United States and HHFA were not to "execute" the agreement. Moreover, section 18 deals generally with two types of entities, governmental agencies and the Bank of California, "who are claimants" but not named parties. If brought into play, it could impose only as much of an obligation on HHFA as it did on the other specified creditors,

---

6. Neither Mr. Woodbury nor Aleutian (his corporation) was a party to the original FHA and FNMA agreements with respect to financing, and therefore plaintiff cannot (and does not attempt to) found a claim on those agreements. See United States v. Neustadt, 366 U.S. 696, 709, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961).

7. Because we dispose of the case on this basis, we do not reach the defendant's special plea of fraud and claim of forfeiture under 28 U.S.C. § 2514. Cf. Little v. United States, 152 F.Supp. 84, 138 Ct.Cl. 773 (1957); Carrier Corp. v. United States, 328 F.2d 328, 334–336, 164 Ct.Cl. 666, 678–81 (1964).

which surely was not one to extend long-term financing.

■ It is true that HHFA was named in the agreement as the "Lender"; that substantial benefits were to flow to it; that certain privileges were bestowed on it; and that it was to undertake important tasks (if it was willing to shoulder them). All of these incidents were specifically delineated; most related solely to management functions involved in completing construction of the project. For example, HHFA was to be furnished with funds for meeting monthly overhead expenses; it was to have the privilege of rejecting, as unacceptable, the individuals selected to be project manager and construction superintendent, as well as of approving subcontractors; it was to supervise disbursement of funds in accordance with the completion agreement, defer collection of interest under its construction loan ("until completion of Project"), and extend for 6 months the maturity date of the short-term promissory note given in exchange for the loan. The mere allocation of these privileges, benefits, and conditions to HHFA is not enough to show that it was legally bound by the agreement. There is no statement that these provisions were to saddle it with any binding obligations or tasks. Rather, the consistent assumption appears to have been that these were actions which the Agency could and would take if it wished to help completion of the project, but that it would not promise to do so. The whole thrust of the pertinent sections is that the Agency was not to be accountable for its actions under the agreement. Indeed, Section 13 specifically provides that "Claimants or other parties signatory [shall not] have any rights or recourse against Lender [HHFA] by reason of *any action Lender may take or omit to take* under the * * * powers" accorded it in the agreement (emphasis added). This was an express disclaimer of all legal liability and legal responsibility on the part of HHFA.

■ Of course, the named parties exchanged mutual, binding promises to resolve their claims in a prescribed manner, but they did so "to *induce* Lender to make and disburse" the proceeds of its construction loan, not to *bind* it to the particular course of action set forth in the document (emphasis added). The arrangement seems deliberately designed to tie down the signatories, but to leave the Federal Government free from legal compulsion; HHFA was to be moved only by the self-interest of its role as the largest creditor (or possibly by governmental magnanimity). We conclude, in short, that this is not the kind of case in which the court should impose a contractual status on the Government when it has not signed (but has deliberately avoided signing) an existing, formal, integrated agreement. See Ambler v. Whipple, 87 U.S. (20 Wall.) 546, 555–556, 22 L.Ed. 403 (1874); Banking & Trading Corp. v. Floete, 257 F.2d 765, 769–770 (C.A.2, 1958); General Motors Corp. v. Abell, 292 F. 922, 927–929 (C.A. 1, 1923), cert. denied, 264 U.S. 583, 44 S.Ct. 332, 68 L.Ed. 861 (1924); Hardwood Package Co. v. Courtney Co., 253 F. 929, 931 (C.A.4, 1918); 1 Corbin Contracts § 30 (1963); cf. Gay v. United States, 174 Ct.Cl. ——, ——, ——, 356 F.2d 516, 521–522, 524 (1966); contrast Penn-Ohio Steel Corp. v. United States, 173 Ct.Cl. ——, ——, 354 F.2d 254, 266–267 (1965).[8]

■ Even if we were to assume that HHFA became a party to the completion agreement, plaintiff could not prevail. The agreement was not negotiated for the purpose of providing or ensuring long-term financing. It had the limited aim of bridging the immediate financial crisis created when Aleutian Homes, Inc., the sponsor and owner of the Kodiak project, failed to satisfy its obligations to subcontractors (and possibly when

---

8. Naturally, the Government could later bind itself by undertaking, after the coming into effect of the completion agreement, specific obligations or contractual undertakings related to or arising out of the functioning of that compact.

plaintiff Woodbury, as guarantor of the Aleutian loan agreement, failed to discharge the sponsor's responsibilities).

The boundaries of the agreement are suggested by its introductory paragraphs.[9] The stated reason was to persuade HHFA to continue periodic payments under its interim construction loan (which had originally been repayable at the end of December 1953). In the fall of 1953, HHFA became unwilling to go on with these payments because it had discovered that there were "unpaid creditors, liens filed against the Project, and other defaults under * * * [the] loan."[10] To melt the frozen flow of federal funds for construction as well as to protect their interests, the creditors exchanged their "mutual promises" to accept specified sums in full discharge of their claims and to forbear from prosecuting their claims against Aleutian, Kodiak Construction Company, and others, during the life of the agreement. From the creditors' standpoint, the prime purpose of the arrangement was to insure that each would be treated as fairly as was then possible, on an equal footing, and in good faith. It is commonplace that when a number of major creditors press unsatisfied claims and liens, as occurred here, mutual agreement for pro rata payments is often the expedient. For the Government, on the other hand, the agreement was a suitable device for preserving at least its major interests under the construction loan. It could have foreclosed, substituted a new sponsor for Aleutian, or looked to the sureties. After considerable study of available alternatives, HHFA chose to go ahead with the completion agreement,

9. "Whereas, Owner has been engaged in constructing a certain housing project consisting of some 344 houses at Kodiak, Alaska, urgently needed by Naval personnel (herein called "Project") which Project is being financed by a loan of $4,230,900 secured by Deed of Trust made by Housing and Home Finance Administrator, hereinafter called "the Lender"; and

"Whereas, a number of creditors of the Owner, the General Contractor and Subcontractors have past due accounts and Lender is unwilling to make further disbursements on said loan because of said unpaid creditors, liens filed against the Project, and other defaults under said loan; and

"Whereas, it is in the best interests of the national defense and of all parties hereto and of Lender, and all other persons having an interest in said Project, to proceed with an early completion of the Project and for an orderly and early retirement of all outstanding bills, claims and liens against the project;

"Now, Therefore, in consideration of the mutual promises contained herein, and in order to induce Lender to make and disburse further proceeds of the loan or any part thereof, it is hereby agreed subject to all the terms and conditions hereof as follows:"

10. On November 25, 1953, HHFA's Washington office wrote, by registered air mail, to plaintiff Woodbury, as President of Aleutian Homes, Inc.: "This agency has been placed on notice that Pacific-Alaska Contractors, Inc. has filed a claim of lien in the amount of $150,504.43 against the project in Kodiak, Alaska.

"We understand that in addition to this lien Aleutian Homes, Inc. and Kodiak Construction Company have a substantial amount of money owing to creditors. Under the Building and Loan Agreement [the HHFA construction loan], Aleutian Homes, Inc. is obligated to furnish any funds required, in addition to proceeds of the loan, for completion of the project. As Guarantor of Aleutian Homes performance under the Building Loan Agreement, you are therefore obligated to provide additional funds required for completion of the project free and clear of all liens.

"You are therefore placed on notice that immediate steps must be taken to provide funds necessary for payment of all bills and satisfaction of the aforementioned lien."

Woodbury was given seven days to reply. On December 3 he responded:

"This letter will serve to notify you that we are in default for failure to comply with the terms of the Building and Loan Agreement on this project and are unable to comply with the demand made by you in respect to said compliance contained in * * * [your letter].

"We request that you declare such default to exist and proceed to make whatever arrangements you deem necessary with whatever persons you should choose as to the completion of this project."

which Mr. Woodbury had proposed. The Agency's view of its position is reflected in a memorandum to the Administrator, on April 5, 1954: "[W]e * * * [are] satisfied that the project * * * [can] be completed without loss to the Government and steps * * * [have been] taken toward accomplishment of this objective at the least risk and to the best interest of the Agency * * *." [11] Completion of the project pursuant to the parties' original financial commitments would also benefit Aleutian, which was bound under the Building and Loan agreement to finish construction, and Mr. Woodbury, who had personally guaranteed the project's construction under that document. On this basis, HHFA decided to acquiesce in the creditors' execution of the completion agreement. The purpose was to help the creditors and the HHFA obtain as much as possible of the amounts owed to them at that time and as a result of continued construction.

█ Conversely, there is no reason to attribute to the completion agreement an intention to transfer responsibility for long-term financing. During the existence of the agreement, Aleutian continued as the owner of the project, and, as such, continued to have the obligation to arrange long-term financing which it had undertaken when the project was originally consummated. The crisis which had evolved around HHFA's interim loan had no direct bearing on the outstanding FHA and FNMA commitments, with respect to permanent financing, which had been obtained by the Brice Mortgage Company early in 1952. The responsibility of arranging such financing was not expressly shifted to HHFA by the completion agreement, and there is no basis for imposing it on defendant by implication (even if we assume the Government to have been a party). The related documents preclude that course. A central one is the "Schedule for Payment of Creditors, Claimants, and Completion Costs", incorporated by reference into the completion agreement. It stated that, "as the project is completed, FHA must insure permanent first mortgages for each house", and that the "Federal National Mortgage Association has issued its commitment to purchase such permanent mortgages." There is no doubt that these references were to the original FHA and FNMA promises to the Brice Company. Those were the only outstanding commitments relating to the Kodiak project. The April 5th memorandum to the HHFA Administrator (quoted above) stated that "FHA and FNMA have reviewed the proposal [the completion agreement] and agree that operations under * * * [it] will not interfere with FHA insurance and FNMA purchase of permanent mortgages." Stage three of the agreement's Payment Schedule began by noting, "As the houses are completed, Brice Mortgage Company will prepare and submit new permanent mortgages for insurance by FHA and purchase by FNMA." These are all references to the original plan for financing through FHA and FNMA which was to be arranged by the sponsor, Aleutian, and by plaintiff.

Moreover, on the same day as the completion agreement was executed, Aleutian submitted a formal, comprehensive request to HHFA for amendment, in accordance with the agreement, of its construction loan authorization.

11. A file memorandum of March 24, 1954, prepared by the same Agency official, stated: "Since December 1953, continous negotiations have been in progress for the purpose of revising the financial structure of the project to the end that the completion of the housing for Naval personnel at Kodiak would be effected promptly and without loss to the Government. It now appears that the negotiations have been successful * * *." Also, a March 11, 1954, letter from Mr. Woodbury's then attorneys to HHFA, reporting in part on their efforts to persuade creditors to accept the completion agreement, closed by noting that it now appears probable that the agreement will be "concluded without loss to anyone other than, possibly, Mr. Woodbury, and Mr. Wynans [the major subcontractor], and that if it is, your agency and the Navy, as well as all the other creditors, will be best served * * *."

In that request, Aleutian, as "Borrower", agreed "to maintain in full force and effect commitments of Commissioner, Federal Housing Administration, to insure permanent first mortgages for Project and from Federal National Mortgage Association to purchase permanent first mortgages for Project". It also acknowledged that no rights of HHFA under any instrument or document relating to Aleutian's indebtedness or obligations, including presumably the right to foreclose, would be destroyed or affected, except as expressly provided. This was contemporaneous recognition by Aleutian that it still had the responsibility for the long-term financing.

It is significant, too, that plaintiff's corporation, Aleutian, continued to act on the basis that the FHA commitment ran to it, and that it (rather than the HHFA) had the obligation to arrange for the long-term financing. On November 30, 1954—six months after the execution of the completion agreement—Aleutian's attorneys[12] forwarded a lengthy "presentation" (in letter form) to FHA's Washington office seeking reconsideration of a denial (by FHA's Alaska office) of its request for an increase in the amount of FHA's insurance commitment to it. That letter stated that "Aleutian Homes, Inc. is the holder of * * * FHA commitments on a Title 203 rental housing project, Kodiak, Alaska." Factual and legal reasons why FHA should grant Aleutian's request for an increase were set forth. The presentation noted that "Aleutian already holds a commitment for insurance guaranty and, therefore, its 'eligibility' is not at issue. Whether or not the regulation [in question] might be applicable to a 'new' application, it certainly should not be applied to a request for an increase to an 'existing' commitment."[13] This letter was signed by the attorneys and by Harry Langton, "Project Manager", for Aleutian Homes, Inc. The whole presentation is persuasive that HHFA never assumed the long-range financing responsibilities now alleged by plaintiff, but that Aleutian and plaintiff continued to bear them.

In these circumstances—in which the earlier written agreements expressly defining the parties' original obligations were referred to, incorporated, and updated to fit into the revised setting formed by the completion agreement, without in any way suggesting that HH FA was to take over the task of arranging and providing for permanent financing—it would be improper to alter or enlarge HHFA's responsibilities merely by tenuous implication from the completion agreement. See Hudson Canal Co. v. Pennsylvania Coal Co., 75 U.S. (8 Wall.) 276, 288–291, 19 L.Ed.2d 349 (1868); Commodity Credit Corp. v. Rosenberg Bros. & Co., 243 F.2d 504, 508–509 (C.A.9, 1957), cert. denied, 355 U.S. 837, 78 S.Ct. 62, 2 L.Ed.2d 48; Ferroline Corp. v. General Aniline & Film Corp., 207 F.2d 912, 922, 926 (C.A.7, 1953), cert. denied, 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098 (1954); Krohner & Wemp v. United States, 110 F.Supp. 730, 734, 126 Ct.Cl. 156, 163 (1953).

12. The letter stated: "Under the provisions of the completion agreement, Aleutian Homes, Inc., as sponsor owner, Kodiak Contruction Co., as prime contractor for construction, and Leo S. Wynans Co. Inc., as major subcontractor for construction, each by proper corporate action, appointed Harry M. Langton as their agent to complete the project under the title 'Project Manager', subject only to the supervision and direction of the HHFA. [We] * * * were appointed as attorneys for the project manager."

13. To buttress its argument, the letter continued: "Separate and apart from the legal questions involved, there are adequate and compelling reasons for your office to reexamine this entire matter and grant the application for increase. The decision of HHFA to proceed under the completion agreement has proved to be sound, since the project has been speedily completed at the lowest possible cost, the Navy's needs have been met, and the hazards of undue delays occasioned by extensive litigation with bonding companies and lienors have been avoided."
*       *       *       *       *

In the light of our conclusion that the obligation of furnishing long-term financing was expressly placed on, and remained on, Aleutian Homes, as the owner of the Kodiak project—and was never transferred to HHFA—it does not matter whether plaintiff is correct in asserting that the Government seized control of the management of the project after the completion agreement. On this point defendant takes issue with virtually all of plaintiff's allegations and conclusions. We cannot resolve many of these disputed factual questions on these motions for summary judgment. But it is unnecessary to do so, for, at their best, the allegations do not supply an adequate basis from which to infer the contractual elements essential to plaintiff's claim. The asserted exercises of control pertain mostly to various aspects of the process of finishing the project which were covered, directly or indirectly, by the completion agreement. They refer, for example, to the defendant's relationship with the project manager and the construction superintendent; to the selection of a rental agent and establishment of rents; to inspection of the houses built; and to disbursement of funds for several purposes. As defendant argues, most of these actions seem to have been authorized by some prior agreement, document, statute, or regulation. But even if all the alleged acts of control by HHFA derived solely from the completion agreement, the whole bundle, when weighed with what we have pointed out, still would not show that HHFA assumed the obligation of providing long-term financing, either as part of the completion agreement itself or as an independent duty under an implied contract arising subsequent to execution of the agreement. The contrary indications are too strong to be overborne even by a zealous or over-zealous effort by HHFA to protect its existing invesment in the project. There is no meaningful allegation that any representation was made or any substantial action undertaken by the Government relating to long-term financing. It is not proper, in the face of all the opposing considerations, to imply any obligation relating to that subject from the mere exercise of control by HHFA. Cf. Sacramento Nav. Co. v. Salz, supra, 273 U.S. at 329, 47 S. Ct. 368, 71 L.Ed. 663; Thomson v. United States, 174 Ct.Cl. ——, ——, 357 F.2d 683, 689–690 (1966).

### III

We turn now to the counterclaims. The Government's amended answer asserts demands against plaintiff (i) as the guarantor of Kodiak Construction Company's general contract with Aleutian for building the project (first counterclaim), and (ii) as guarantor of the Building Loan Agreement (HHFA's interim loan) between Aleutian and HHFA (second counterclaim). Defendant has moved for summary judgment only on the latter of these claims (and we are not certain whether the first is abandoned). Plaintiff seeks dismissal of both the charges. The issues are important to the parties and, conceivably, to others; the arguments are many-pronged and complicated, drawing vitality from both factual and legal roots. The papers before us are not adequate for resolution of the controversy. In these circumstances, we deny both motions without prejudice and remit this aspect of the case to the trial commissioner for further proceedings. This course, available to the court in its discretion, is the appropriate method of facilitating the fair and intelligent resolution of the questions presented on the counterclaims. See Anthony Grace & Sons, Inc. v. United States, 345 F.2d 808, 810, 170 Ct.Cl. 688, 691–692 (1965), rev'd in part on other grounds, United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed. 2d 662 (1966).

Generally, the Government's argument is that Mr. Woodbury's guaranty of the Building Loan Agreement entails a personal obligation, on his part, to repay Aleutian's promissory note of April 27,

1953. Plaintiff's main response is that this guaranty extended only to construction of the project, not to payment of the note, and that, in any event, the completion agreement, and the actions of the Government under it, bar any recovery here (on several legal grounds, such as accord and satisfaction, release, discharge, etc.). The positions of both parties rely, directly and by inference, on a welter of background circumstances. Disposition of these contentions may, for example, require an inquiry into what effect, if any, the HHFA and plaintiff anticipated that the completion agreement (or acts taken as a result of it) would have on the plaintiff's prior obligations. There may be need to determine whether there was adequate compliance with the conditions of various documents, such as that of "written demand of Lender" in the loan agreement guaranty. Proper resolution of the counterclaims may also involve interpretation of the meaning and interrelationship of a number of formidable instruments, including the Building Loan Agreement, plaintiff's Guaranty, the Loan Authorization, and Aleutian's Note and the Pledge Agreement. Possibly, each of these could be construed in various ways, and evidence outside of the documents might be material. This listing is not exhaustive, but it does indicate that, at this stage, summary judgment is inappropriate. Finally, remand will enable the Government to clarify its stand on the first counterclaim, based on Woodbury's guaranty of the Kodiak contract, which defendant has not raised before us.

For the reasons stated in Part II, supra, defendant's motion for summary judgment as to Woodbury's breach of contract claim is granted and plaintiff's is denied. Plaintiff is not entitled to recover, and the petition will be dismissed after disposition of the counterclaims. Defendant's motion for summary judgment on its second counterclaim is denied without prejudice, as is the plaintiff's motion to dismiss both counterclaims, on the grounds set forth in Part III, and the case is returned to the trial commissioner for further proceedings on the counterclaims in accordance with this opinion.