Raymond L. **WELLS**
v.
The **UNITED STATES.**
No. 89–70.

United States Court of Claims.
July 14, 1972.

OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on April 20, 1972. Plaintiff has filed no exceptions to or brief on this report and the time for so filing pursuant to the rules of the court has expired. On June 15, 1972, defendant filed a motion that the court adopt the commissioner's opinion, findings of fact and recommended conclusion of law as the basis for its judgment in this case. Since the court agrees with the opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case, without oral argument. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

OPINION OF COMMISSIONER

GAMER, Commissioner:

In 1959, plaintiff, an investor in real estate, owned certain land located on Lee Street in Knoxville, Tennessee. Pursuant to an Agreement to Lease entered into on October 7, 1959 with defendant, represented by an official of the Post Office Department, plaintiff constructed on such property, in accordance with plans and specifications approved by the Department, a building for its use as a bulk mail facility. Upon completion of construction, and in accordance with the Agreement to Lease, the Department, by a Lease for Post Office Quarters dated April 29, 1960, rented the building, which became known as the Lee Street

Myron Ray Ely, Knoxville, Tenn., attorney of record, for plaintiff.

Arthur C. Latina, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS and KUNZIG, Judges.

Parcel Post Annex, for a term of five years at a rental of $18,000 per annum.[1]

At this time, plaintiff was dealing with the Department through a real estate agent (who was also an attorney). The agent, under a trusteeship arrangement with plaintiff, was the record title holder of the property. Since there is now no dispute about plaintiff's having been the actual owner of the property (which in fact was, pursuant to the trust arrangement, subsequently reconveyed to plaintiff and his wife), the term "plaintiff" will, for convenience, sometimes be used herein, when referring to events in the period during which the trusteeship arrangement existed (1959–1964), as applicable either to plaintiff himself or his agent.

A portion of plaintiff's claim arises from certain work performed by the construction contractor (or his subcontractors) that plaintiff employed to construct the building. Plaintiff contends that such work constituted changes or extras not called for by the approved plans and specifications, and that certain officials attached to the Knoxville Post Office and to the Post Office Department's regional office at Memphis, Tennessee (which region was handling the details of the construction and lease of the facility), took it upon themselves, without plaintiff's knowledge or consent, to order such changes or extras to be made by direct instructions to the construction contractor (or his subcontractors). Plaintiff maintains that he was required to pay his construction contractor $14,671.39 for such extra work; that defendant has refused to reimburse him therefor; and that the rental for the building, agreed to prior to its erection and calculated upon plaintiff's investment therein based upon the approved plans and specifications, did not afford such reimbursement. Plaintiff seeks payment here for such extras.

This portion of the claim is not allowable for several reasons.

One of the principal stumbling blocks is that the record is wholly unclear as to who were the officials who gave the alleged orders and instructions with respect to the particular changes or extras about which plaintiff complains. Further, where some identification is attempted, there is no showing that the individuals involved were officials vested with the requisite authority to order construction changes or extras in a situation of this kind. Without such a showing, recovery is not permissible. L. B. Samford, Inc. v. United States, 410 F.2d 782, 187 Ct.Cl. 714 (1969).

There was no Government construction contract of the usual kind here involved. The only construction contract that was entered into was between the plaintiff and a contractor of his own selection. Since the Government was not a party to that contract, no Government official, of course, would have any authority to give work orders with respect thereto. Indeed, the record is again unclear as to what was the nature of the "orders," "instructions," or "directions" that were allegedly given by defendant's officials to the construction contractor with respect to the work in question.

Further, the record is not sufficient to support plaintiff's contention that neither he nor his agent knew about or authorized the extras. Plaintiff's own witness, the president of the construction contracting firm, testified flatly that since his contract was with plaintiff's agent, he would not take any instructions from any Government official about the work he was to perform; that he insisted upon an authorization from plaintiff or his agent before he performed the work in question; and that all of such work was in fact authorized and paid for by the agent.[2]

The only contract to which defendant was a party during the period the building was being constructed was the

---

1. The lease gave defendant two 2-year and one 1-year renewal options at $15,000 per annum.

2. Transcript, pp. 231–36.

Agreement to Lease. If defendant desired, after construction commenced, that certain changes be made in the building which it was to occupy as a tenant, there was a regular procedure by which such changes could be effected and appropriate compensation made by defendant therefor in the form of additional rent. Plaintiff and his agent were familiar with this procedure because it was actually utilized. During February 1960 the Post Office Department decided that the facility should have six concrete block docks and metal canopies. It so advised plaintiff's agent and requested a cost figure. The construction contractor's quotation was acceptable to defendant and the extra work was authorized in the specified amount under an agreement specifically providing therefor and further providing that "the lease * * will be considered as amended to provide payment for the work upon satisfactory completion of the same, such payment to be in a lump sum as additional rental under the lease." The agreement was executed on defendant's behalf by the Regional Real Estate Manager, the only Post Office Department official in the region here involved who was authorized to enter into amendatory rent agreements of this kind.[3] The record contains no similar amendments to the 1959 Agreement to Lease or the 1960 lease itself with respect to any of the extras comprising the claim herein.[4]

■ Finally, since the building, including the alleged extras, was completed and occupied by defendant in 1960, and this suit was not filed until 1970, the claim, insofar as it seeks compensation for the extras as construction items, is clearly barred by the six-year statute of limitations applicable to this court.[5]

As to the statute of limitations point, plaintiff argues that, even if the extras are not recoverable as construction items completed in 1960, they nevertheless are properly includable in the damages growing out of asserted breach of contract claims which accrued in 1965 and thereafter. These breach of contract claims are grounded upon the following facts and contentions.

Even prior to the completion of the facility in 1960, plaintiff learned from the Knoxville postmaster and other Department officials at the Memphis regional office that they felt the facility would be too small, and that they had already recommended, or would shortly so recommend, that it be enlarged. Their feelings were based upon their estimates of the rate of growth in the amount of parcel post that Knoxville would be required to handle and the increase in the number of employees that would be necessary to handle it. As part of their planning, they inquired of plaintiff whether he owned the vacant land adjoining the property upon which the facility was being built and whether it would be available for the proposed enlargement in the event it was authorized.

Plaintiff did not own such property. However, he gave immediate consideration to purchasing it. If he were not able to accommodate the Department's needs for a larger facility, renewals of the initial lease, and therefore the investment plaintiff was making in his property, would be endangered. Plain-

---

3. In another instance of two proposed extras, defendant decided, in view of the price quotations which plaintiff's agent submitted, to hold the construction of one item in abeyance, and to forgo making the other. (finding 24)

4. As a result, the exact nature of the extras or changes themselves, as well as the reasonable cost or value thereof, are insufficiently delineated. What the record does show as to the nature of the alleged extras or changes is set forth in findings 18–23. The first written claim presented

for the extras was by letter of July 26, 1960, from plaintiff's agent to the Regional Real Estate Manager. That letter claimed only $7,635.36 (finding 31(a)). The Manager, in response, requested "an itemized statement of the amount of the extras" and "the names of the postal officials who authorized the additional work." (finding 31(b)) The record contains no response setting forth the requested data.

5. 28 U.S.C. §§ 2401, 2501 (1970).

tiff knew, from the relatively short term provided in the Agreement to Lease, that this facility was regarded by the Department as only a temporary one. The Department originally desired only a 3-year lease. Plaintiff wanted one of ten years' duration. The Department refused to agree to a term longer than five years and this was the basis of the parties' agreement. The Department wanted to keep itself in the flexible position of being able to establish and move to a more permanent type of facility. On the other hand, considering costs and other alternatives, it might be desirable, even if still on a temporary basis, to continue to operate in an enlarged facility, if not at plaintiff's location, then at some other.

Plaintiff took his dilemma to his attorney, who advised him against purchasing the adjoining property because of the lack of any commitment by the Department headquarters in Washington, whose approval was necessary concerning facilities of this nature. However, when, in further discussions with the Knoxville postmaster and officials of the Memphis Region, plaintiff was actually shown a plan of the enlarged facility which they were recommending to Washington, and which included a large maintenance garage, plaintiff, after again consulting his attorney, decided to attempt to purchase the property. Plaintiff was further encouraged by the fact that the Post Office Department had caused a topographic survey of the property to be made. In January 1960, while he was constructing the facility, plaintiff purchased a part of the adjoining property, being unable at that time to purchase the balance of it. In December of that same year, however, he was able to purchase such balance, but was required to pay a price therefor which he considered to be exorbitant.

In the meantime, plaintiff was not succeeding in establishing his claim for the extras. However, by letter of September 28, 1960, he advised the Regional Real Estate Manager that "if the new plant will become a reality and a new lease negotiated, we can work these extras in the new lease." By this plaintiff meant that, since an accepted method of calculating rentals on leased post office facilities was to base the amount of the rental upon the cost or value of the land and the building, the extras would necessarily be reflected in his total cost or investment in the property.

However, several years went by without any approval by Post Office Department headquarters of the enlarged facilities which the Tennessee officials were recommending. Meanwhile, plaintiff was obliged to undergo the expense of carrying the additional, unimproved land he had purchased, and was not receiving, by way of rentals from an enlarged facility, the hoped-for reimbursement of the extras. Complaints by plaintiff's agent to the local Tennessee departmental employees about the delay always brought forth assurances that they had strongly recommended that the proposed enlargement be approved but that this was the extent of their authority in the matter. A complaint in June 1961 to Senator Kefauver about the delay by Washington (and the nonpayment of the extras, which now were said to have cost $12,000), brought forth the response from the Post Office Department that it was still considering "the possibility of expanding the present quarters * * * to satisfy our future requirements or whether a completely new facility should be acquired." [6] Plaintiff began to give serious consideration to developing the additional property for other possible users. However, again fearing that this would jeopardize a renewal of his present lease if approval of the enlargement did materialize, he decided to continue to hold the property for possible Post Office Department develop-

---

6. As to the extras, the response stated that the only extra the Department had negotiated with plaintiff was for the docks and canopies, but that "should it be determined the present facility can be satisfactorily expanded," plaintiff "may negotiate with the Department for what he feels is a more equitable rental."

ment and a new and larger lease which would, he hoped, also afford reimbursement for the extras.

Finally, in the early part of 1964, *i. e.,* about a year prior to the expiration on March 15, 1965, of the then current lease of the facility, the Post Office Department decided that for the next five years its needs would be adequately served if the facility were enlarged by a relatively modest addition to cost about $35,000. This was a disappointment to plaintiff since the proposed enlargement would utilize only a portion of the additional land he had purchased in 1960. The balance would remain unproductive.

Nevertheless, plaintiff decided to negotiate for a new lease for the enlarged facility, and after lengthy conferences with the Post Office Department's real estate representative, executed an Agreement to Lease dated August 7, 1964, as modified by a letter of October 1, 1964, which agreement was accepted by the Deputy Assistant Postmaster General on November 18, 1964.[7] The agreement, as modified, provided for the construction of the addition and for a lease of the facility as enlarged, to commence not later than March 16, 1965 (*i. e.,* upon the expiration of the current lease), and to run for five years at a rental of $24,000 per annum.[8] Upon completion of the addition, and pursuant to the Agreement to Lease, plaintiff and defendant entered into a 5-year lease of the enlarged facility, the rental figures being changed, however, to reflect defendant's assumption of liability for the annual taxes of $3,680.40 on the building and the land upon which it stood, the new rental figure thus being $20,319.60 per annum.[9]

Because of the increasing demands made on the Lee Street Parcel Post Annex, the Knoxville postmaster and officials of the Memphis Region again recommended to departmental headquarters a further expansion of the facility. In 1968, the Department approved their recommendation. Consequently, the Memphis Region once more commenced negotiations with plaintiff for an agreement whereby plaintiff would construct the proposed addition, thus utilizing the part of plaintiff's property which was still vacant. The proposed enlargement was more substantial than the previous one, its cost being estimated at $200,000. Plaintiff found, however, that he could not obtain the necessary construction and permanent financing therefor unless the Post Office Department would agree to a 10-year lease over which period the required loans (including the refinancing of the existing mortgage on the property) would be liquidated. The Department refused to agree to such a lease term, and was not interested in the rental figure of over $75,000 per annum which plaintiff quoted on a 5-year lease basis (and which was designed to liquidate the required new loan of over $350,000).

Plaintiff felt that his inability to provide the Department with the enlarged facilities it required upon terms satisfactory to it threatened its continued occupancy of his property after the expiration on March 15, 1970, of the then current 5-year lease. This would further adversely affect a stringent financial condition in which plaintiff happened to be at that time. Accordingly, plaintiff decided to sell the facility and all the land he had purchased for the venture, including the unproductive property which he had been carrying for so long. On September 19, 1968, plaintiff sold the facility and the land upon which it stood to the Lee Street Corporation of Knoxville, Tennessee, and by a deed dated March 12, 1969, formalized the sale to such corporation of the adjacent unimproved land.

By an Agreement to Lease accepted by defendant on February 28, 1969, the

---

7. At this time, plaintiff took over the negotiations himself, the property having by then all been reconveyed to him (and his wife), making him the owner of record. Plaintiff's former trustee-agent now acted as plaintiff's attorney-adviser.

8. With two 5-year renewal options at $18,000 per annum.

9. Similarly, such assumption reduced the rental for the renewal option periods to $14,319.60.

Lee Street Corporation was able to arrive at an agreement with the Post Office Department for the enlarged facility on a 5-year basis (at a rental of $56,358 per annum). However, the Corporation and the defendant, by a superseding Agreement to Lease accepted by defendant in March 1970, agreed upon a 10-year lease (at a rental of $53,500 per annum).

Plaintiff asserts that, although defendant's officials refused to reimburse him for the extras as 1960 construction items, they nevertheless led him to believe that, in the event the lease would be renewed, the new rental figure would be calculated so as to take the extras into consideration. He contends that the statements of defendant's officials in this respect amounted to assurances that rose to the level of a contractual commitment, which, he maintains, was breached because, in his view, the rental specified in the second lease reflected no such consideration or reimbursement. The situation was aggravated, he says, by the fact that, when he continued to complain about the extras during the period of the second lease, the officials again kept reassuring him about taking care of the matter at the next lease renewal time, an eventuality which never occurred because, he maintains, of their unreasonable refusal to enter into a 10-year lease with him, although they ultimately did enter into such a lease with the Lee Street Corporation. These breaches, plaintiff asserts, occurred in 1965 when the second lease was entered into, and in 1968, when plaintiff was unable to arrive at satisfactory terms for a third lease, both dates being within the six-year statute of limitations since the petition herein was, as shown, filed in 1970.[10]

■ These contentions too cannot be the basis of any recovery. The record simply does not support the contention that any authorized Post Office Department official made any effective commitment that the extras would ultimately be paid for in the form, and as a part, of the rental that would be contained in any lease renewal. Indeed, there was never anything in the nature of a commitment by anyone that there would be any renewal at all. Plaintiff well knew that this facility was considered to be a temporary one; that included in defendant's overall planning was the possibility of a new facility of a more permanent type; and that that was the very reason for defendant's insistence upon as short a lease term as possible.

But more important, an examination of the basis upon which the amount of the rental for the second lease was arrived at fails to support plaintiff's assertion that no consideration was given to the extras. Such rental was calculated upon the basis of plaintiff's investment in (a) the original building and the land upon which it stood; and (b) the addition to such building and the additional land utilized therefor. Plaintiff's figures on these items were accepted by defendant. Although plaintiff had the original building constructed for approximately $89,000, and now was asserting that the extras amounted to approximately $14,700, making a total of $103,700, plaintiff's statement of the cost of the building was $115,000 (with a then current depreciated value of over $94,000). The record does not contain a satisfactory breakdown of this $115,000 figure, but the testimony adduced on plaintiff's behalf was that it did include the extras,[11] as it obviously must have.

In any event, if plaintiff felt that the ultimately negotiated rental figure on the second lease did not in fact afford him full reimbursement for the extras, either by reason of the shortness of the term or otherwise, there was no obligation on his part to enter into the lease. Further, even if he did not enter into it, he could at that time have promptly

10. On this extras item plaintiff claims damages in the amount of $24,434.33, composed of $14,671.39 as the cost of the extras, plus $9,762.94 as interest thereon at 6 percent compounded annually from 1960 through September 1968, when he sold the facility.

11. Tr., pp. 320–21.

sued for the extras as construction items if he concluded that defendant had breached an understanding to take care of them in the form of the rental. Such a suit would then have been timely. The conclusion is compelled that plaintiff knew exactly what he was doing in entering into this lease. There were long negotiations and plaintiff was well advised by at least two attorneys (his former trustee and an attorney-officer of the bank that was financing plaintiff with respect to this facility).

■ The balance of plaintiff's claim, also based upon alleged breaches of understandings which are said to have assumed the status of contractual commitments, is similarly based upon the above described events. Plaintiff says that he was induced by defendant's officials to purchase the additional property in 1960, and that such purchase was made with the understanding that the property would be promptly used for the enlarged facility. He contends that in breach of such understanding, defendant failed to utilize any part of such additional property until the second lease in 1965, and that the balance of the property was, through defendant's unjustified failure to enter into a 10-year lease, never utilized during plaintiff's ownership thereof. Plaintiff claims his loss on the additional land he purchased in 1960, which he calculates to be over $45,500.[12]

■■ This claim cannot be allowed. It is plain that there was no commitment given by any authorized official that the Post Office Department would utilize the land in question at any particular time or indeed at any time. Plaintiff was not obligated to hold the property over the years for defendant's use, as two of plaintiff's attorneys who contemporaneously counselled plaintiff concerning various aspects of this project admitted at the trial herein. Plaintiff surely knew this for he gave serious consideration to developing the property for others, the decision not to do so resting on purely economic considerations. The purchase of the property was made originally because of plaintiff's knowledge of the recommendations of the local Tennessee officials concerning an expansion, but plaintiff was well aware of the fact that the expansion would have to be approved by departmental headquarters and that there was no assurance when, if ever, such approval would be made. That plaintiff was and is disappointed that his investment in the property did not turn out to be a profitable one is understandable, but that plaintiff was not "induced" to make the investment in any contractually legal sense is plain. A purchase of property by a real estate investor made on the chance that plans and recommendations of local Government officials, of which he is cognizant, will materialize, but with full knowledge by the investor that such plans and recommendations are subject to approval by departmental headquarters, cannot later be made the subject of a breach of contract claim when the plans and recommendations of the local officials do not receive the expected approval. *Cf.* Woodbury v. United States, 364 F.2d 993, 176 Ct.Cl. 838 (1966). Where "action with reference to the contract to be executed between the parties is subject to approval by another and that approval is not subsequently given, no binding contract exists on which the United States may be required to respond in damages as for a breach." Ship Construction Co. v. United States, 91 Ct.Cl. 419, 462 (1940), cert. denied, 312 U.S. 699, 61 S.Ct. 737, 85 L.Ed. 1133 (1941). And as the court stated in Kilmer Village Corp. v. United States, 153 F.Supp. 393, 139 Ct.Cl. 231 (1957), in holding that "negotiations" held "primarily for the purpose of entering into a lease" did not result in any implied contract, it being known that "[n]othing could or would be done until the lease was agreed upon and signed by the parties. * * *":

It is probably the rule rather than the exception that money is spent and not

---

12. Including interest of 6 percent on his investment in such property compounded annually from 1960 through March 1969,

when the balance of the property was finally sold.

recovered in circumstances where a contract is not consummated. The fact that plaintiffs lost money is not enough. [153 F.Supp. at 397, 139 Ct. Cl. at 236]

■ Further, the record does not permit the conclusion that the Lee Street Corporation's ability to obtain a 10-year lease, although plaintiff was unable to do so, was based, as plaintiff charges, upon an unjustified and unlawful discrimination against plaintiff. Plaintiff's negotiations with defendant preceded the sale of the facility in September 1968. The Lee Street Corporation's proposal of a 10-year lease was not accepted by defendant until March 1970. During this period of almost two years, there was a change in the situation concerning the facility itself, as well as in economic conditions in general. Actually, insofar as its term was concerned, the initial Agreement to Lease that the Corporation was able to obtain from defendant, which was based upon negotiations in 1968 entered into shortly after its purchase of the facility, was no better than had been offered to plaintiff, *i. e.*, five years. However, as indicated, ever since the establishment of the Lee Street Parcel Post Annex as a temporary bulk mail facility there had been plans for a new major postal facility for Knoxville of a more permanent type. After defendant's approval in February 1969 of the Corporation's first Agreement to Lease, the plan for the construction of the new facility was deferred to such an extent as to make a 10-year lease of the temporary facility feasible. In addition, in 1969 interest rates soared, so increasing the Corporation's costs of financing the construction and ownership of the enlarged facility as to cause it to press for a longer term lease. Considering the situation as it existed in March 1970, the Post Office Department agreed to a superseding Agreement to Lease for ten years. The new agreement, however, set a lower annual rental figure and made other changes.[13] Thus, plaintiff's and

the Lee Street Corporation's situations, and the conditions facing the Department at the different times involved, were dissimilar. There is no evidence of any unlawful discrimination against plaintiff.

For all of the reasons indicated, plaintiff is not entitled to recover.

59 CCPA

---

13. Included in such changes was an increase in the size of the enlarged facility's platform from 6,050 to 6,203 square feet, and a substantial increase in the parking and maneuvering area from 34,050 to 47,989 square feet.