Per Curiam:
This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on April 20,1972. Plaintiff has filed no exceptions to or brief on this report and the time for so filing pursuant to the rules of the court has expired. On June 15, 1972, defendant filed a motion that the court adopt the commissioner’s opinion, findings of fact and recommended conclusion of law as the basis for its judgment in this case. Since the court agrees with the opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case, without oral argument. Therefore, plaintiff is not entitled to recover and the petition is dismissed.
OPINION OF COMMISSIONER
Gamer, Commissioner:
In 1959, plaintiff, an investor in real estate, owned certain land located on Lee Street in Knoxville, Tennessee. Pursuant to an Agreement to Lease entered *327 into on October 7, 1959 with, defendant, represented by an official of the Post Office Department, plaintiff constructed on such property, in accordance with plans and specifications approved by the Department, a building for its use as a bulk mail facility. Upon completion of construction, and in accordance with the Agreement to Lease, the Department, by a Lease for Post Office Quarters dated April 29, 1960, rented the building, which became known as the Lee Street Parcel Post Annex, for a term of five years at a rental of $18,000 per annum.[1]
At this time, plaintiff was dealing with the Department through a real estate agent (who was also an attorney). The agent, under a trusteeship arrangement with plaintiff, was the record title holder of the property. Since there is now no dispute about plaintiff’s having been the actual owner of the property (which in fact was, pursuant to the trust arrangement, subsequently reconveyed to plaintiff and his wife), the term “plaintiff” will, for convenience, sometimes be used herein, when referring to events in the period during which the trusteeship arrangement existed (1959-1964), as applicable either to plaintiff himself or his agent.
A portion of plaintiff’s claim arises from certain work performed by the construction contractor (or his subcontractors) that plaintiff employed to construct the building. Plaintiff contends that such work constituted changes or extras not called for by the approved plans and specifications, and that certain officials attached to the Knoxville Post Office and to the Post Office Department’s regional office at Memphis, Tennessee (which region was handling the details of the construction and lease of the facility), took it upon themselves, without plaintiff’s knowledge or consent, to order such changes or extras to be made by direct instructions to the construction contractor (or his subcontractors). Plaintiff maintains that he was required to pay his construction contractor $14,671.39 for such extra work; that defendant has refused to reimburse him therefor; and that the rental for the building, agreed to prior to its erection and calculated upon *328 plaintiff’s investment therein based upon the approved plans and specifications, did not afford such reimbursement. Plaintiff seeks payment here for such extras.
This portion of the claim is not allowable for several reasons.
One of the principal stumbling blocks is that the record is wholly unclear as to who were the officials who gave the alleged orders and instructions with respect to the particular changes or extras about which plaintiff complains. Further, where some identification is attempted, there is no showing that the individuals involved were officials vested with the requisite authority to order construction changes or extras in a situation of this kind. Without such a showing, recovery is not permissible. L. B. Samford, Inc. v. United States, 187 Ct. Cl. 714, 410 F. 2d 782 (1969).
There was no Government construction contract of the usual kind here involved. The only construction contract that was entered into was between the plaintiff and a contractor of his own selection. Since the Government was not a party to that contract, no Government official, of course, would have any authority to give work orders with respect thereto. Indeed, the record is again unclear as to what was the nature of the “orders,” “instructions,” or “directions” that were allegedly given by defendant’s officials to the construction contractor with respect to the work in question.
Further, the record is not sufficient to support plaintiff’s contention that neither he nor his agent knew about or authorized the extras. Plaintiff’s own witness, the president of the construction contracting firm, testified flatly that since his contract was with plaintiff’s agent, he would not take any instructions from any Government official about the work he was to perform; that he insisted upon an authorization from plaintiff or his agent before he performed the work in question; and that all of such work was in fact authorized and paid for by the agent.[2]
The only contract to which defendant was a party during the period the building was being constructed was the Agree- *329 meiit to Lease. If defendant desired, after construction commenced, that certain changes be made in the building which it Avas to occupy as a tenant, there was a regular procedure by which such changes could be effected and appropriate compensation made by defendant therefor in the form of additional rent. Plaintiff and his agent were familiar with this procedure because it was actually utilized. During February 1960 the Post Office Department decided that the facility should have six concrete block docks and metal canopies. It so advised plaintiff’s agent and requested a cost figure. The construction contractor’s quotation was acceptable to defendant and the extra work was authorized in the specified amount under an agreement specifically providing therefor and further providing that “the lease * * * will be considered as amended to provide payment for the work upon satisfactory completion of the same, such payment to be in a lump sum as additional rental under the lease.” The agreement was executed on defendant’s behalf by the Regional Real Estate Manager, the only Post Office Department official in the region here involved who was authorized to enter into amendatory rent agreements of this kind.[3] The record contains no similar amendments to the 1959 Agreement to Lease or the 1960 lease itself with respect to any of the extras comprising the claim herein.[4]
Finally, since the building, including the alleged extras, was completed and occupied by defendant in 1960, and this suit was not filed until 1970, the claim, insofar as it seeks compensation for the extras as construction items, is clearly barred by the six-year statute of limitations applicable to this court.[5]
*330 As to the statute of limitations point, plaintiff argues that, even if the extras are not recoverable as construction items completed in 1960, they nevertheless are properly includable in the damages growing out of asserted breach of contract claims which accrued in 1965 and thereafter. These breach of contract claims are grounded upon the following facts and contentions.
Even prior to the completion of the facility in 1960, plaintiff learned from the Knoxville postmaster and other Department officials at the Memphis regional office that they felt the facility would be too small, and that they had already recommended, or would shortly so recommend, that it be enlarged. Their feelings were based upon their estimates of the rate of growth in the amount of parcel post that Knoxville would be required to handle and the increase in the number of employees that would be necessary to handle it. As part of their planning, they inquired of plaintiff whether he owned the vacant land adjoining the property upon which the facility was being built and whether it would be available for the proposed enlargement in the event it was authorized.
Plaintiff did not own such property. However, he gave immediate consideration to purchasing it. If he were not able to accommodate the Department’s needs for a larger facility, renewals of the initial lease, and therefore the investment plaintiff was making in his property, would be endangered. Plaintiff knew, from the relatively short term provided in the Agreement to Lease, that this facility was regarded by the Department as only a temporary one. The Department originally desired only a 3-year lease. Plaintiff wanted one of ten years’ duration. The Department refused to agree to a term longer than five years and this was the basis of the parties’ agreement. The Department wanted to keep itself in the flexible position of being able to establish and move to a more permanent type of facility. On the other hand, considering costs and other alternatives, it might be desirable, even if still on a temporary basis, to continue to operate in an enlarged facility, if not at plaintiff’s location, then at some other.
*331 Plaintiff took his dilemma to his attorney, who advised him against purchasing the adjoining property because of the lack of any commitment by the Department headquarters in Washington, whose approval was necessary concerning facilities of this nature. However, when, in further discussions with the Knoxville postmaster and officials of the Memphis Region, plaintiff was actually shown a plan of the enlarged facility which they were recommending to Washington, and which included a large maintenance garage, plaintiff, after again consulting his attorney, decided to attempt to purchase the property. Plaintiff was further encouraged by the fact that the Post Office Department had caused a topographic survey of the property to be made. In January 1960, while he was constructing the facility, plaintiff purchased a part of the adjoining property, being unable at that time to purchase the balance of it. In December of that same year, however, he was able to purchase such balance, but was required to pay a price therefor which he considered to be exorbitant.
In the meantime, plaintiff was not succeeding in establishing his claim for the extras. However, by letter of September 28, 1960, he advised the Regional Real Estate Manager that “if the new plant will become a reality and a new lease negotiated, we can work these extras in the new lease.” By this plaintiff meant that, since an accepted method of calculating rentals on leased post office facilities was to base the amount of the rental upon the cost or value of the land and the building, the extras would necessarily be reflected in his total cost or investment in the property.
However, several years went by without any approval by Post Office Department headquarters of the enlarged facilities which the Tennessee officials were recommending. Meanwhile, plaintiff was obliged to undergo the expense of carrying the additional, unimproved land he had purchased, and was not receiving, by way of rentals from an enlarged facility, the hoped-for reimbursement of the extras. Complaints by plaintiff’s agent to the local Tennessee departmental employees about the delay always brought forth assurances that they had strongly recommended that the proposed enlarge *332 ment be approved but that this was the extent of their authority in the matter. A complaint in June 1961 to Senator Kefauver about the delay by Washington (and the nonpayment of the extras, which now were said to have cost $12,000), brought forth the response from the Post Office Department that it was still considering “the possibility of expanding the present quarters * * * to satisfy our future requirements or whether a completely new facility should be acquired.”[6] Plaintiff began to give serious consideration to developing the additional property for other possible users. However, again fearing that this would jeopardize a renewal of his present lease if approval of the enlargement did materialize, he decided to continue to hold the property for possible Post Office Department development and a new and larger lease which would, he hoped, also afford reimbursement for the extras.
Finally, in the early part of 1964, i.e., about a year prior to the expiration on March 15, 1965, of the then current lease of the facility, the Post Office Department decided that for the next five years its needs would be adequately served if the facility were enlarged by a relatively modest addition to cost about $35,000. This was a disappointment to plaintiff since the proposed enlargement would utilize only a portion of the additional land he had purchased in 1960. The balance would remain unproductive.
Nevertheless, plaintiff decided to negotiate for a new lease for the enlarged facility, and after lengthy conferences with the Post Office Department’s real estate representative, executed an Agreement to Lease dated August 7,1964, as modified by a letter of October 1, 1964, which agreement was accepted by the Deputy Assistant Postmaster General on November 18, 1964.[7] The agreement, as modified, provided *333 for the construction of the addition and for a lease of the facility as enlarged, to commence not later than March 16, 1965 (i.e., upon the expiration of the current lease), and to run for five years at a rental of $24,000 per annum.[8] Upon completion of the addition, and pursuant to the Agreement to Lease, plaintiff and defendant entered into a 5-year 'lease of the enlarged facility, the rental figures being changed, however, to reflect defendant’s assumption of liability for the annual taxes of $3,680.40 on the building and the land upon which it stood, the new rental figure thus being $20,319.60 per annum.[9]
Because of the increasing demands made on the Lee Street Parcel Post Annex, the Knoxville postmaster and officials of the Memphis Kegion again recommended to departmental headquarters a further expansion of the facility. In 1968, the Department approved their recommendation. Consequently, the Memphis Eegion once more commenced negotiations with plaintiff for an agreement whereby plaintiff would construct the proposed addition, thus utilizing the part of plaintiff’s property which was still vacant. The proposed enlargement was more substantial than the previous one, its cost being estimated at $200,000. Plaintiff found, however, that he could not obtain the necessary construction and permanent financing therefor unless the Post Office Department would agree to a 10-year lease over which period the required loans (including the refinancing of the existing mortgage on the property) would be liquidated. The Department refused to agree to such a lease term, and was not interested in the rental figure of over $75,000 per annum which plaintiff quoted on a 5-year lease basis (and which was designed to liquidate the required new loan of over $350,000).
Plaintiff felt that his inability to provide the Department with the enlarged facilities it required upon terms satisfactory to it threatened its continued occupancy of his property after the expiration on March 15, 1970, of the then current 5-year lease. This would fui'ther adversely affect a stringent *334 financial condition in which plaintiff happened to be at that time. Accordingly, plaintiff decided to sell the facility and all the land he had purchased for the venture, including the unproductive property which he had been carrying for so long. On September 19,1968, plaintiff sold the facility and the land upon which it stood to the Lee Street Corporation of Knoxville, Tennessee, and by a deed dated March 12,1969, formalized the sale to such corporation of the adjacent unimproved land.
By an Agreement to Lease accepted by defendant on February 28, 1969, the Lee Street Corporation was able to arrive at an agreement with the Post Office Department for the enlarged facility on a 5-year basis (at a rental of $56,358 per annum). However, the Corporation and the defendant, by a superseding Agreement to Lease accepted by defendant in March 1970, agreed upon a 10-year lease (at a rental of $53,500 per annum).
Plaintiff asserts that, although defendant’s officials refused to reimburse him for the extras as 1960 construction items, they nevertheless led him to believe that, in the event the lease would be renewed, the new rental figure would be calculated so as to take the extras into consideration. He contends that the statements of defendant’s officials in this respect amounted to assurances that rose to the level of a contractual commitment, which, he maintains, was breached because, in his view, the rental specified in the second lease reflected no such consideration or reimbursement. The situation was aggravated, he says, by the fact that, when he continued to complain about the extras during the period of the second lease, the officials again kept reassuring him about taking care of the matter at the next lease renewal time, an eventuality which never occurred because, he maintains, of their unreasonable refusal to enter into a 10-year lease with him, although they ultimately did enter into such a lease with the Lee Street Corporation. These breaches, plaintiff asserts, occurred in 1965 when the second lease was entered into, and in 1968, when plaintiff was unable to arrive at satisfactory terms for a third lease, both dates being *335 within the six-year statute of limitations since the petition herein was, as shown, filed in 1970.[10]
These contentions too cannot be the basis of any recovery. The record simply does not support the contention that any authorized Post Office Department official made any effective commitment that the extras would ultimately be paid for in the form, and as a part, of the rental that would be contained in any lease renewal. Indeed, there was never anything in the nature of a commitment by anyone that there would be any renewal at all. Plaintiff well knew that this facility was considered to be a temporary one; that included in defendant’s overall planning was the possibility of a new facility of a more permanent type; and that that was the very reason for defendant’s insistence upon as short a lease term as possible.
'But more important, an examination of the basis upon which the amount of the rental for the second lease was arrived at fails to support plaintiff’s assertion that no consideration was given to the extras. Such rental was calculated upon the basis of plaintiff’s investment in (a) the original building and the land upon which it stood; and (b) the addition to such building and the additional land utilized therefor. Plaintiff’s figures on these items were accepted by defendant. Although plaintiff had the original building constructed for approximately $89,000, and now was asserting that the extras amounted to approximately $14,700, making a total of $103,700, plaintiff’s statement of the cost of the building was $115,000 (with a then current depreciated value of over $94,000). The record does not contain a satisfactory breakdown of this $115,000 figure, but the testimony adduced on plaintiff’s behalf was that it did include the extras,[11] as it obviously must have.
In any event, if plaintiff felt that the ultimately negotiated rental figure on the second lease did not in fact afford him full reimbursement for the extras, either by reason of the *336 shortness of the term or otherwise, there was no obligation on his part to enter into the lease. Further, even if he did not enter into it, he could at that time have promptly sued for the extras as construction items if he concluded that defendant had breached an understanding to take care of them in the form of the rental. Such a suit would then have been timely. The conclusion is compelled that plaintiff knew exactly what he was doing in entering into this lease. There were long negotiations and plaintiff was well advised by at least two attorneys (his former trustee and an attorney-officer of the bank that was financing plaintiff with respect to this facility).
The balance of plaintiff’s claim, also based upon alleged breaches of understandings which are said to have assumed the status of contractual commitments, is similarly based upon the above described events. Plaintiff says that he was induced by defendant’s officials to purchase the additional property in 1960, and that such purchase was made with the understanding that the property would be promptly used for the enlarged facility. He contends that in breach of such understanding, defendant failed to utilize any part of such additional property until the second lease in 1965, and that the balance of the property was, through defendant’s unjustified failure to enter into a 10-year lease, never utilized during plaintiff’s ownership thereof. Plaintiff claims Ms loss on the additional land he purchased in 1960, which he calculates to be over $45,500.[12]
This claim cannot be allowed. It is plain that there was no commitment given by any authorized official that the Post Office Department would utilize the land in question at any particular time or indeed at any time. Plaintiff was not obligated to hold the property over the years for defendant’s use, as two of plaintiff’s attorneys who contemporaneously counseled plaintiff concerning various aspects of this project admitted at the trial herein. Plaintiff surely knew this for *337 he gave serious consideration to developing the property for others, the decision not to do so resting on purely economic considerations. The purchase of the property was made originally because of plaintiff’s knowledge of the recommendations of the local Tennessee officials concerning an expansion, but plaintiff was well aware of the fact that the expansion would have to be approved by departmental headquarters and that there was no assurance when, if ever, such approval would be made. That plaintiff was and is disappointed that his investment in the property did not turn out to be a profitable one is understandable, but that plaintiff was not “induced” to make the investment in any contractually legal sense is plain. A purchase of property by a real estate investor made on the chance that plans and recommendations of local Government officials, of which he is cognizant, will materialize, but with full knowledge by the investor that such plans and recommendations are subject to approval by departmental headquarters, cannot later be made the subject of a breach of contract claim when the plans and recommendations of the local officials do not receive the expected approval. Cf. Woodbury v. United States, 176 Ct. Cl. 838, 364 F. 2d 993 (1966). Where “action with reference to the contract to be executed between the parties is subject to approval by another and that approval is not subsequently given, no binding contract exists on which the United States may be required to respond in damages as for a breach.” Ship Construction Co. v. United States, 91 Ct. Cl. 419, 462 (1940), cert. denied, 312 U.S. 699 (1941). And as the court stated in Kilmer Village Corp. v. United States, 139 Ct. Cl. 231, 153 F. Supp. 393 (1957), in holding that “negotiations” held “primarily for the purpose of entering into a lease” did not result in any implied contract, it being known that “[njothing could or would be done until the lease was agreed upon and signed by the parties. * * *” :
It is probably the rule rather than the exception that money is spent and not recovered in circumstances where a contract is not consummated. The fact that plaintiffs lost money is not enough. [139 Ct. Cl. at 236, 153 F. Supp. at 397]
*338 Further, the record does not permit the conclusion that the Lee Street Corporation’s ability to obtain a 10-year lease, although plaintiff was unable to do so, was based, as plaintiff charges, upon an unjustified and unlawful discrimination against plaintiff. Plaintiff’s negotiations with defendant preceded the sale of the facility in September 1968. The Lee Street Corporation’s proposal of a 10-year lease was not accepted by defendant until March 1970. During this period of almost two years, there was a change in the situation concerning the facility itself, as well as in economic conditions in general. Actually, insofar as its term was concerned, the initial Agreement to Lease that the Corporation was able to obtain from defendant, which was based upon negotiations in 1968 entered into shortly after its purchase of the facility, was no better than had been offered to plaintiff, i.e., five years. However, as indicated, ever since the establishment of the Lee Street Parcel Post Annex as a temporary bulk mail facility there had been plans for a new major postal facility for Knoxville of a more permanent type. After defendant’s approval in February 1969 of the Corporation’s first Agreement to Lease, the plan for the construction of the new facility was deferred to such an extent as to make a 10-year lease of the temporary facility feasible. In addition, in 1969 interest rates soared, so increasing the Corporation’s costs of financing the construction and ownership of the enlarged facility as to cause it to press for a longer term lease. Considering the situation as it existed in March 1970, the Post Office Department agreed to a superseding Agreement to Lease for ten years. The new agreement, however, set a lower annual rental figure and made other changes.[13] Thus, plaintiff’s and the Lee Street Corporation’s situations, and the conditions facing the Department at the different times involved, were dissimilar. There is no evidence of any unlawful discrimination against plaintiff.
For all of the reasons indicated, plaintiff is not entitled to recover.
*339 FINDINGS OF FACT
1. This action was filed on March 12, 1970, to recover $70,097.08, approximately $14,000 of which represents the cost to plaintiff of extra items added to the construction of a postal facility 'allegedly authorized and not paid for by postal officials. The remainder of the claim represents losses allegedly suffered by plaintiff through the failure of defendant to utilize land purchased by plaintiff for the future expansion of the original postal facility.
2. Plaintiff is a resident of Knoxville, Tennessee, and engages in the buying and seEing of real estate, as well as in the holding of real estate for investment purposes.
3. In 1957, plaintiff was the owner of certain property in KnoxviUe, Tennessee, known at Lots 158 and 159 in Dameron’s Addition, located on the west side of Lee Street in the Eleventh Ward. Title to the property was initially held in the name of the East Tennessee Title Insurance Agency, Inc., as trustee for plaintiff, which agreed to convey, at plaintiff’s direction or order, the title to anyone designated by plaintiff. There was a small building on the property occupied by a business tenant which paid rent to plaintiff. Plaintiff paid $22,500 for these lots which he purchased as an investment. Riddick & Lavin, a firm of realtors in Knoxville, Tennessee, handled the rent collections for plaintiff.
4. During the latter part of 1958 the Post Office Department decided to establish a temporary bulk mail facility in efast Tennessee. Mr. Hugh W. Overton, a Post Office Department official located at Chattanooga, Tennessee, who was the Real Estate Officer for north Alabama and east Tennessee, was given the assignment of finding an appropriate site for such facility. In such connection, he was furnished with a tentative set of nondetailed plans which were designed to indicate the nature and size of the property desired. Mr. Overton’s responsibility covered the negotiations for a lease of the property, upon which a suitable building was to be built by the owner of the property, at an appropriate annual rental to be paid by the Post Office Department.
*340 5. (a) After investigation, Mr. Overton concluded that the above-mentioned property owned by plaintiff would be an adequate site for the proposed facility. There was a railroad siding at the rear of the property. Mr. Overton contacted Mr. Riddick, the real estate agent for the property. Plaintiff authorized Mr. Riddick to negotiate with the Post Office Department. To facilitate the negotiations, plaintiff had title to the property conveyed to Mr. Riddick, as trustee, on September 24, 1959. In addition to being a realtor, Mr. Riddick was also an attorney. Shortly after such conveyance, the two lots were, on October 8,1959, conveyed back to plaintiff (and his wife). However the deed of reconveyance was not recorded until May 18,1962.
(b) Mr. Overton furnished Mr. Riddick with the plans he had so as to enable Mr. Riddick to have prepared detailed plans and specifications for the building which would be constructed by Mr. Riddick and which would be required to meet the needs of the Post Office Department. Since the facility was intended to be only a temporary one, Mr. Overton stated that a 3-year lease was desired. However, Mr. Riddick (and plaintiff) desired that the lease term be ten years. After conferring with his superiors, who advised him that the longest lease term the Post Office Department would consider for this facility would be five years, Mr. Overton so advised Mr. Riddick.
6. After conferences between plaintiff, Mr. Riddick, and the George W. Reagan Company, a general contractor which would be employed by plaintiff to draw up the detailed plans and specifications and to construct the facility, plaintiff decided he would, through Mr. Riddick, submit a proposal to construct the facility on his property, and to lease it to the Post Office Department at a certain rental. By letter of September 10, 1959, Mr. Riddick submitted such a proposal to Mr. C. Edwin Graves, the Postmaster of the United States Post Office at Knoxville, Tennessee. The proposal was for the construction of a building on the property which would be 225 feet long facing Lee Avenue, and extending 70 feet back to the railroad siding at the rear. Enclosed plans indicated the dimensions and the construction details. Speci *341 fications for the electrical and plumbing work were also submitted. The proposed rental was $1.25 per square foot for a 3-year lease (with, renewal options), or $1.18 per square foot for a 5-year lease (also with renewal options). The proposal indicated readiness by the Reagan Company to commence construction immediately and to have it completed by December 9,1959.
7. (a) The responsibility for the actual construction of post office facilities in the region in which Knoxville, Tennessee, was located, and for the approval of the plans and specifications of such facilities to be built for occupancy by the Post Office Department in such region, was that of the Chief Regional Engineer, located at the Memphis regional office, Memphis, Tennessee. The responsibility for handling the final working up of a satisfactory lease proposal which he could recommend for acceptance was that of the Regional Real Estate Manager, also located in the Memphis Regional Office. Actual approval of such proposals involving construction of facilities for lease by the Post Office Department could be made only by the Department’s headquarters in Washington, D.C. At that time, Mr. John K. Witherspoon was the Regional Real Estate Manager, and Mr. W. C. St. John was the Chief Regional Engineer.
(b) By letter of September 18, 1959, Mr. Witherspoon advised Mr. Riddick that the Chief Regional Engineer had, after studying the plans submitted with Mr. Riddick’s letter of September 10,1959, concluded that certain changes would be necessary. Enclosed was a drawing prepared by the Engineer, together with a list of required changes and additions. Mr. Riddick was requested to submit another set of drawings and an “Agreement to Lease” form, referred to as Post Office Department Form 1400, which would set forth the proposed rental, after which the bid would “be given immediate consideration.”
8. By an Agreement to Lease Form 1400 dated September 22, 1959, Mr. Riddick agreed to lease for postal purposes the premises above described for a term of three years from the date of completion of the proposed building (then estimated to be January 81,1960) at an annual rental of $19,- *342 687.50. The building was described as a one story concrete block-brick front bulk mail facility.
9. By letter of September 25,1959, Mr. Riddick submitted to Mr. Witherspoon new drawings in compliance with Mr. Witherspoon’s letter of September 18, 1959.
10. (a) By a telephone conversation with Mr. Riddick had prior to September 28, 1959, Mr. Witherspoon advised that if Mr. Riddick would reduce the rental specified in the “Agreement to Lease” he had submitted to $18,000 per annum, and would extend the lease term to five years with renewal options, he would recommend to Washington, D.C., the acceptance of the proposal. He also advised that, to facilitate the obtaining of a construction bond, it would be agreeable to extend the completion date of the building to March 31, 1960. To further expedite matters, he stated he would prepare and send to Mr. Riddick, for his execution, a form of modification letter containing the changes discussed.
(b) By a letter dated September 28, 1959, Mr. Wither-spoon, in accordance with the telephone conversation, forwarded to Mr. Riddick the “letter of modification to your bid.” The letter stated that “As soon as the letter of modification and the bond are returned to this office, your bid, as modified, will be sent to Washington with our strong recommendation for its acceptance.”
11. By letter of September 29,1959, Mr. Riddick executed and submitted the “modification letter” prepared by Mr. Witherspoon. The letter was addressed to the Postmaster General in Washington, D.C., referred to Mr. Riddick’s “bid dated September 22, 1959” (i.e., the Agreement to Lease Form 1400), and stated that the bid “is hereby modified by extending the lease term from three years to five years, and reducing the rental from $19,687.50 per annum to $18,000.00 per annum.” Options to renew for two, two, and one year, all at $15,000 per annum, were also granted. Further, the date of completion of the building proposed to be erected on the property was set forth as March 31,1960.
12. The George W. Reagan Company, Inc., had submitted a bid to Mr. Riddick to construct the facility for $88,311, *343 plus $662.33 representing the cost of the required performance bond.
13. (a) On October 7,1959,, defendant accepted the Agreement to Lease Form 1400 dated September 22, 1959, which Mr. Riddick had submitted, subject to the modification letter of September 27, 1959. The acceptance was by Mr. K. L. Bahrdoux, Acting Director of Real Estate.
(b) By letter of October 8,1959, Mr. Witherspoon advised Mr. Riddick that the Post Office Department had accepted his bid as set forth in his Agreement to Lease Form 1400, as modified by his letter of September 29, 1959.
14. By an agreement between the George W. Reagan Company, Inc., and Mr. Riddick, as trustee, entered into on October 16, 1959, the Reagan Company agreed to construct the facility for $88,973. The completion date was specified as March 31,1960, with construction to commence on October 20, 1959.
15. (a) By letter of October 19,1959, to Mr. Riddick, Mr. W. C. St. John, the Chief Regional Engineer, advised that his office was “responsible for inspecting the construction and accepting the building,” and that “Inasmuch as your preliminary drawings have been approved 'by the Department, construction may commence.” Mr. Riddick was requested to forward “the complete construction drawings and specifications when they are finished.”
(b) Shortly thereafter, Mr. Riddick submitted the detailed construction drawings and specifications which were prepared by the Reagan Company and approved by Mr. St. John.
16. By letter of January 14, 1960, to the Turner Electric Company, which, as a subcontractor of the Reagan Company, was performing the electrical work for the facility (a copy of the letter being sent to Mr. Riddick), Mr. St. John sent a copy of the Post Office Department publication covering “Portable Conveyors,” and advised concerning the models of conveyors which were to be incorporated in the building. The conveyors were to be supplied by the Post Office Department, and required appropriate amounts of electrical power for their proper operation.
*344 17. (a) During February 1960, the Post Office Department decided that the facility should have six concrete block docks and six metal canopies. It so informed Mr. Riddick at that time and requested him to advise what the cost thereof would be. The Reagan Company, by letter of February 25, 1960, quoted a price of $1,800 therefor and Mr. Riddick forwarded the quotation to Mr. Witherspoon, who, by .telephone, thereafter authorized Mr. Riddick to proceed with the work. By letter of March 15, 1960, Mr. Witherspoon forwarded to Mr. Riddick an original and six copies of an agreement providing for the construction of such docks and canopies at said price. Mr. Riddick was requested to execute “the original and five copies of the agreement properly signed, so that payment may be authorized.”
(b) The “agreement,” in the form of a letter dated March 16, 1960, from Mr. Riddick to the Postmaster General, Washington, D.C., provided that “the lease * * * will be considered as amended to provide payment for the work upon satisfactory completion of the same, such payment to be in a lump sum as additional rental under the lease.” Mr. Witherspoon accepted the agreement for “the Government” on March 21,1960.
18. (a) By letter of February 24, 1960, Mr. St. John advised Mr. Riddick that the Knoxville postmaster had informed him that the double doors at the facility under construction had not been provided with spring steel bumpers, that such doors would receive heavy abuse, and that “it is felt that a bumper of some type should be provided in order to protect the double action doors.” Enclosed with the letter was a drawing showing “a suggested type of bumper that might be incorporated on the doors that have been installed at this facility.” The letter closed with the statement that “It would be appreciated if you would notify this office of your plans regarding this matter.”
(b) The plans and specifications for the facility did not indicate any such bumpers. Mr. Riddick ordered the Reagan Company to install such bumpers on the doors 'as Mr. St. John suggested. Plaintiff paid the Reagan Company such *345 additional amount as the bumpers cost. However, there was no reimbursement made to plaintiff or to Mr. Riddick therefor in the settlement of the accounts relating to the construction of the building. The record does not indicate what the cost of such door bumpers was.
(c) The Knoxville postmaster did not at that time (nor does he now have) the authority to negotiate for facilities, to commit defendant to pay therefor, or for construction work hr connection therewith, or to authorize any changes or extras on any post office construction work in process. In these respects, his only authority is to recommend proper facilities, and to request the appropriate regional officials to take the necessary action concerning his recommendations. His request is made to the Operations Division of the Memphis Regional Office. If the request is approved, the matter is then turned over to the Real Estate Division of the Region for execution.
19. (a) On an inspection of the facility prior to its opening, Postmaster Graves and Mr. Quentin Ferguson, a regional official in the office of Mr. St. John, noticed that the swinging doors did not have any glass inserts. Mr. Graves indicated the desirability, in the interests of safety, of having glass in the doors so that a person on one side would be able to see what activity was taking place on the other before proceeding through. Although Mr. Graves never spoke to either Mr. Riddick or plaintiff about the matter, some employee of defendant subsequently did talk to Mr. Riddick about it, and Mr. Riddick thereafter ordered that glass be installed in the doors. The plans and specifications did not call for such glass, and either Mr. Riddick or plaintiff reimbursed the Reagan Company for the cost thereof. The record does not indicate what the cost of such work was.
(b) The record does not indicate the identity of defendant’s employee who spoke to Mr. Riddick about the glass in the doors. Mr. Riddick was deceased at the time of the trial herein. Also, the record does not indicate what such person said to Mr. Riddick about the matter. The record contains no written agreement, order, or authorization issued by any *346 duly authorized official of the defendant with respect to such work.
20. (a) Prior to final completion of the facility, it became apparent that the pavement constructed on the Lee Street side of the facility for a driveway for the use of mail trucks and for a parking area would not be sufficient to support some of the trucks with their heavy loads. The Reagan Company’s approved plans and specifications had provided for pavement consisting of a 6-inch base and 2 inches of asphalt topping. This was sufficient to support loads up to 60,000 pounds, the truck limit under Tennessee law. However, because some mail trucks carried heavier loads, they became mired down in the asphalt. The Reagan Company called Mr. Riddick’s attention to this situation by letter of April 18, 1960.
(b) Mr. Riddick authorized the Reagan Company to strengthen the pavement by increasing the topping to 3 inches, and, at the entrance, to change it from asphalt to concrete. The Reagan Company performed such work.
(c) The record does not indicate who, if anyone, employed by defendant, authorized any such extra work, nor does it satisfactorily indicate what the cost thereof was. The record contains no written agreement, order, or authorization issued by any duly authorized official of the defendant with respect to such work.
21. (a) During the construction of the facility, some employee of the defendant suggested the advisability of a retaining wall on the north side of the driveway. Such a wall would serve to enlarge the driveway area and permit six to eight more feet in which the large mail trucks could maneuver. It also protected against slides from the bank. No such wall was shown on the approved plans, nor was it called for in the specifications. Pursuant to plaintiff’s authorization, Mr. Riddick ordered the wall to be built and the Reagan Company did build such a concrete retaining wall, receiving payment for such extra work from Mr. Riddick.
(b) The record does not satisfactorily indicate who was the employee of the defendant who suggested or authorized *347 the construction of the wall[1] or whether such employee was duly authorized to order and commit defendant to pay for changes or extra work of the type involved in the retaining wall in question. The record does not indicate what was the cost of such change or extra work. The record contains no written agreement, order, or authorization issued by any duly authorized official of the defendant with respect to such work.
22. (a) The conveyors defendant furnished, which were larger than anticipated, would not operate on the electricity which was specified in the specifications for the electrical work, and changes in such work, including rewiring, were required. Following conferences between an unidentified official or officials from the Chief Regional Engineer’s Office in Memphis and the Turner Electric Company, the electrical subcontractor, the changes required for the proper operation of the conveyors were agreed upon. At the same time, other electrical changes, such as additional outlets, plugs, and fixtures, were agreed upon. Such additional changes were agreed upon in part because the lighting was inadequate. The Turner Electric Company made the changes and performed the additional work. Mr. Riddick authorized the making of the changes by the Turner Electric Company, which submitted a bill to the Reagan Company therefor in the sum of $2,767.75. The record does not show how much Mr. Riddick or plaintiff paid to the Reagan Company for such electrical changes and extra work, but payment in at least the amount charged by the Turner Electric Company was made.
(b) In settling the accounts relating to the construction of the facility, no reimbursement was made by defendant to Mr. Riddick or plaintiff for the electrical changes and extras.
(c) The record does not indicate who were the employees of defendant who ordered or suggested or agreed upon the *348 electrical changes or extras, or whether they had the authority to order any such changes or extra work. The record contains no written agreement, order, or authorization issued by any duly authorized official of the defendant with respect to such changes or work.
23. (a) At defendant’s request, Mr. Eiddick (with plaintiff’s authorization) permitted defendant to occupy the facility prior to completion. Occupancy commenced in the middle of March 1960. At the time only half of the driveway had been paved. Early occupancy by defendant impeded construction operations. Adverse winter weather added to the difficulties. The paving of only part of the driveway area resulted in a damlike formation and caused a pileup of mud, rock, and dirt. This resulted in a difficult and expensive cleanup and hauling operation when the balance of the driveway had to be paved. Plaintiff considers such expense as an extra one attributable to the early occupancy by the Post Office Department and one he would not have had to incur had the Post Office Department not moved in prior to the originally contemplated occupancy date.
(b) The cost of removing the mud, rocks, and dirt when it came time to pave the area was approximately $3,000. The record does not show how much of such cost was attributable to early occupancy of the facility by the defendant. The record contains no written agreement executed by any duly authorized official of the defendant committing defendant to pay for any extra expenses, including cleanup, caused plaintiff by reason of the early occupancy.
24. (a) During the course of construction, Mr. Graves, the Knoxville postmaster, felt it would be desirable to have three floor-type lookout galleries installed at the facility, as well as a handrail on the north end, and wire mesh on the south end of a loading dock. He so advised the Eegional Office which, on March 31, 1960, sent to Mr. Eiddick drawings showing what was desired and a request that Mr. Eiddick advise what the cost of such additions would be. Mr. Eiddick in turn gave the drawings to the Eeagan Company and requested it to furnish him with a price for the proposed extras. By letter of April 26, 1960, the Eeagan Company *349 quoted Mr. Riddick a price of $3,066 for the lookout galleries and $175 for the handrail and wire mesh. By letter of April 28,1960, Mr. Riddick forwarded the Reagan Company’s letter of April 26, 1960, to Mr. St. John. He also advised in the letter that Mr. Graves had informed him that the wire mesh on the south end of the dock would not be necessary, leaving $75 for the handrail.
(b) By letter dated May 3, 1960, to Mr. Riddick, Mr. St. John advised that it had been decided to hold the construction of the lookout galleries in abeyance. He also advised that $75 was considered excessive for the handrail; that it was, therefore, “not being recommended”; and that “this matter will be discussed with the postmaster at a later date.”
25. The work on the facility was satisfactorily completed by April 27,1960.
26. By letter of April 28, 1960, Mr. Riddick advised Mr. Witherspoon that the docks, which had been authorized as an extra in the amount of $1,300, had been completed and that payment therefor was now due. The letter also advised that “Mr. Ferguson authorized George W. Reagan Company to install two sets of iron steps from two of these rail docks. This will add an additional $187.00 making a total of $1,487.00.” Mr. Ferguson was an employee in the office of the Chief Regional Engineer and had made inspections of the facility during its construction to make certain that the building was being constructed in accordance with the approved plans and specifications.
27. On May 4, 1960, John G. Riddick, Trustee, and the defendant, acting by Harold Duncan, Director of Real Estate, executed a lease, dated April 29, 1960, for the facility, referred to as the Lee Street Parcel Post Annex. The lease was for a term of five years commencing March 16,1960, at a rental of $18,000 per annum, with two 2-year and one 1-year renewal options, at $15,000 per annum. The lease provided, among other things, that the lessor should pay all taxes.
28. (a) By letter of June 80, 1960, to Mr. Riddick, the Turner Electric Company submitted a list of “Extra work furnished and installed at Lee Street Mail Handling Fa *350 cility as ordered by Post Office Officials for conveyors, lights, plugs, etc.” No dollar amount was set forth in the letter.
(b) By a statement of the same date to Mr. Riddick, the Reagan Company, under the heading, “Extra to contract,” listed four items, as follows:
April 30 Invoice dock stops- 292. 71
April 30 Invoice concrete slab & wall- 1379. 33
April 30 Invoice Post Office Extras- 4030. 02
June 30 Invoice, mise, items--- 1933. 30
Total _$7635.36
29. With respect to Mr. Riddick’s letter of April 28,1960, requesting payment of $1,300 for the docks and $187 for the iron steps, defendant did pay the $1,300. However, it refused to make payment for the iron steps on the grounds that Mr. Ferguson did not authorize such work and that no such work had in fact been authorized by the Regional Real Estate Manager, the only regional official who was authorized to approve extras of such kind.
30. After the refusal by Mr. Witherspoon to pay for the iron steps, Mr. Riddick discussed with Mr. Witherspoon not only such extra work but also other extra work which Mr. Riddick claimed had been performed in accordance with requests of the Post Office Department officials, including the work hereinabove referred to which had been listed by the Turner Electric Company in its letter of June 30, 1960, and the work included in the Reagan Company statement of the same date. Mr. Riddick claimed reimbursement from the Post Office Department for such work as work not included in the plans and specifications which the Post Office Department had approved.
31. (a) By letter of July 26, 1960, to Mr. Witherspoon, concerning “the various extras that were necessary for the operation of the new Lee Street Parcel Post plant here in Knoxville,” Mr. Riddick stated:
We both understand that the project went through quite hurriedly without adequate specifications and I have had $7635.36 worth of extras (in addition to the loading docks and canopies) of which $4030.02 were electric work alone which was mostly caused by the type *351 of conveyors delivered for the use of the parcel post plant not being of the specifications furnished by. the subcontractor, Turner Electric Company. I bad no idea that the extras would not be taken care of by the Post Office Department until the controversy over the iron steps to the dock or I would certainly have taken this matter up before the work was done.
I would greatly appreciate it if you would contact me on your next trip to Knoxville so that we may discuss these extras or if this is not possible, I will be glad to send you an itemized list of all extras that were necessary for the proper use of this plant.
(b) By letter of August 5, 1960, to Mr. Riddick, Mr. Witherspoon requested “an itemized statement of the amount of extras which went into the building and the names of the postal officials who authorized the additional work.”
32. (a) Almost from the commencement of construction of the facility in 1959, the Knoxville postmaster and the officials at the Memphis Region acquainted Mr. Riddick with the fact that they felt the facility being constructed would be too small and that, considering the rate of growth in the amount of parcel post that Knoxville had to handle, and the increase in the number of employees that would be required to handle such amount, they had recommended or would shortly recommend to headquarters at Washington, D.C., that the facility be enlarged, the addition to include a maintenance garage. In this connection, they inquired whether the vacant land south of the facility and adjoining Lots 158 and 159, upon which the facility was being constructed, was available in the event of such enlargement.
(b) Plaintiff did not own such adjoining property at that time. However, plaintiff gave consideration to the advisability of purchasing such of the adjoining property as would be required to accommodate the enlargement of the facility which the Knoxville and Memphis Post Office Department officials envisioned. Plaintiff consulted an attorney about the advisability of purchasing the additional property, but the attorney advised against the purchase because of the lack of assurance that the Post Office Department would proceed with the enlargement. However, after the Knoxville *352 and Memphis officials showed Mr. Biddick a tentative plan of the addition which they stated they would recommend to Washington, D.C., plaintiff, after again consulting his attorney, decided to purchase the adjoining property. Defendant had caused a topographic map to be made, and plaintiff felt this activity was further evidence of the serious nature of defendant’s intentions. On January 26,1960, he purchased a part of Lot 157, measuring 80 feet by 200 feet, from the Bogers Lumber Supply Company, Inc., for which he paid $17,500. Plaintiff was unable at that time to purchase the balance of the land he desired to acquire and which he felt would be required for the proposed enlargement.
33. By letter of September 28, 1960, Mr. Biddick responded to Mr. Witherspoon’s letter of August 5, 1960, as follows:
In. accordance with your recent letter pertaining to the extras at the Knoxville Lee Street Parcel Post Annex, I have not sent the itemized extras to you before as I thought I would have an opportunity to go over them with Mr. Ferguson.
However, on his recent trip here, the opportunity did not present itself, so I am sending them to you, and I think that you will agree these items were not incorporated in the original plans and the cost was not reflected in the rental value.
However, if the new plant will become a reality and a new lease negotiated, we can work these extras in the new lease. Please advise.
34. On December 6,1960, John G. Biddick, as trustee, purchased from the Bogers Lumber and Supply Company the additional property he had previously sought to acquire, being Lot 156, except a rectangular tract consisting of 57 by 100 feet, and an additional portion of Lot 157. Plaintiff paid $32,500 for the 148-by-200-foot portion of Lot 156 which he purchased. On December 7,1960, plaintiff and his wife conveyed to John G. Biddick, trustee, the 80 by 200 feet part of Lot 157 which they had acquired on January 26, 1960. On December 7, 1960, John G. Biddick, trustee, transferred to plaintiff title to such portions of Lots 156 and 157 as had been purchased. On December 6, 1960, John G. Biddick, *353 trustee, purchased the 57-by-100-foot portion of land of Lot 156. As of this time, plaintiff or his trustee had full ownership of Lots 156,157,158, and 159. Plaintiff was the beneficial owner of all of said property, which, together with the original Lots 158 and 159 also owned by plaintiff, was sufficient for the enlarged facility which the Knoxville and Memphis Post Office officials recommended to the Washington headquarters be authorized.
35. By letter of January 9, 1961, Mr. Witherspoon responded to Mr. Riddick’s letter of September 28, 1960, as follows:
Reference is made to your letter of September 28, 1960? concerning the Lee Street Parcel Post Annex. The itemized list of extras was sent to our Chief Regional Engineer and later to the Postmaster at Knoxville, Tennessee. Both the Chief Regional Engineer and the Postmaster state that they did not authorize any of the expenditures for any of these items.
If you can furnish any more definite information 's to who authorized the various items, we will again investigate to see whether approval for the payment of any of these items can be obtained.
36. (a) By June 1961, plaintiff became concerned about the Post Office Department’s failure to approve the proposed addition to the facility and, consequently, the nonutilization of the additional land which he had purchased. Such purchases had been financed by loans, on which plaintiff was paying interest, and plaintiff was in addition liable for the taxes on such property. Conversations by Mr. Riddick (who was acting for plaintiff) with Mr. Witherspoon and Mr. Graves only resulted in their assuring him that they had strongly recommended to the Washington headquarters that the proposed enlargement be approved but that this was the extent of their authority in the matter. Prior to June 8,1961, Mr. Witherspoon retired and was succeeded by Mr. Overton, who, to Mr. Reddick’s concern, was quite unfamiliar with the proposed enlargement project. Plaintiff began to give consideration to the possibility of developing the additional property he had purchased for other possible users, but feared that if he did so, he would make it impossible for the *354 Post Office Department to expand at the present site, which would cause it to give up such site at the expiration of its current 5-year lease. On June 8, 1961, Mr. Riddick wrote the following letter to Mr. Ferguson, who was then the Assistant Regional Engineer at Memphis:
I was surely sorry to hear that Mr. Witherspoon had retired for Mr. Overton doesn’t seem to remember anything about enlarging the Lee Street Parcel Post facility. I talked to Mr. Overton over the phone and about the only thing that he could remember was that we did not have adequate ground, but as you know, I have taken care of this situation by purchasing all of the property to Dameron Avenue and back to the railroad a distance of 228 feet by 200 feet deep.
I purchased this property for at that time you and Mr. Witherspoon and Mr. Graves were fairly sure that a mechanized building and facility would be built. I also know that a topo map was made by Sehom & Kennedy, Engineers of Knoxville.
You can understand why I am so perturbed over this condition not hearing a word from anyone as I have owned this property for the past six months and I had to pay four times as much as I did for the original parcel post location.
I don’t know just what course to take to find out something definite regarding this situation and would appreciate any suggestions from you. I talked to Mr. Graves upon several occasions and he is always very optimistic and says the thing is in the mill and will be in shortly and so on.
Our new Northwest Expressway will take considerable commercial buildings between Jackson Avenue and Depot Street. There are some large firms there, such as Swift & Co., Armour & Co. and several grocery warehouses, and I feel it is my duty to protect myself on my investment to contact these people regarding a building for them on the Lee Street property. However, I know that this would jeopardize the renewal of the present lease with the Post Office Department. I would appreciate it if you can give me any information regarding the above.
(b) By letter of June 9, 1961, to Senator Kefauver, Mr. Riddick again complained about the nonutilization of his property. In such letter, he stated that he had purchased the *355 additional land because of the opinion of Postmaster Graves and Regional Real Estate Manager Witherspoon “that this facility was entirely too small” and the fact that “[t]hey then requested if additional ground could be secured adjoining this new building.” He stated that he felt the plans and specifications for the proposed enlargement “have been in Washington some four months.” The letter closed as follows:
I would also like for you to know that when figuring and arriving at the rental for the present building, the rent was figured on the cost of the ground and the contractor’s bid on the building. However, the building cost Twelve Thousand Dollars more than the original contract. No compensation for this additional money spent was figured in the original lease. Mr. Edwin Graves, our Postmaster, assumes approximately Four Thousand Dollars of this. I don’t know, and apparently nobody in the Post Office Department in Memphis and Knoxville, who gave the authority for the other additions to the original plans. This was caused by inadequate specifications furnished by the Post Office Department. In a new building and a new lease this Twelve Thousand Dollars could be absorbed and I would not continue to lose interest monthly on this additional expenditure. If not, I certainly would like to know how I could recover on same. Even though Mr. Graves assumes some of this additional expenditure, I never received any satisfaction from Mr. Witherspoon for this amount and as I stated above, Mr. Overton seems to be very unfamiliar with this situation.
I would greatly appreciate your checking into this for me if possible and advise any information that you could.
37. By letter of June 15, 1961, to Mr. Riddick, written in response to Mr. Riddick’s letter of June 8,1961, to Mr. Ferguson, Mr. P. L. Coleman, the Postal Installations Manager, advised that “the matter is currently under study by Departmental Headquarters,” that “we are not in a position to advise you of any approved plans at this time,” and that “the additional land now available will be considered in arriving at a decision on the project.”
*356 38. Mr. Riddick’s letter of June 9, 1961, to Senator Kefauver was referred to tbe Post Office Department, which, by letter of August 28,1961, to the Senator from the Executive Assistant to the Postmaster General, stated that it was fully understood by all parties that “the quarters which Mr. Riddick offered to construct would be on a temporary basis and would not satisfy our long-term requirements”; that “work has been in progress here in the Department to determine the possibility of expanding the present quarters with additional maneuvering and parking area to satisfy our future requirements or whether a completely new facility should be acquired,” but that “a final decision has not been made.” The letter then stated:
* * * While a survey was being conducted to determine our future needs at the Knoxville facility, Mr. Riddick was contacted to determine if additional land area was available. No contract or commitment was made or implied by any representatives of the Regional Office with Mr. Riddick which would result in his acquiring the property for our use.
Further, as to the extras, the letter stated:
The only additional expenditure we negotiated with Mr. Riddick above the original contract was for additional canopies and dock space for which he was reimbursed in full by a lump-sum payment. Our lease on the present post office is a firm, binding contract which cannot be broken at the convenience of either party. In view of the above, and as we have no authority for increasing the present rental rate, we cannot grant Mr. Riddick’s request. However, should it be determined the present facility can be satisfactorily expanded, and Mr. Riddick is agreeable, he may negotiate with the Department for what he feels is a more equitable rental rate. * * *
39. Plaintiff decided not to develop the property adjoining the facility for other purposes but instead to hold it for the planned expansion of the post office facility and for a further lease to the Post Office Department of the enlarged facility at a rental which he hoped would also serve to reimburse him for the cost of the extras on the original construction.
*357 40. Up to June 15,1964, most of the negotiations relating to the construction and leasing of the postal facility in question took place between the postal officials and John G. Rid-dick, trustee. On that date, Mr. Riddick executed a formal declaration that he had been acting and serving as trustee for Raymond Wells who was the owner of the premises occupied by the United States Government on Lee Street in the City of Knoxville, Tennessee, and of the lease thereon. By the declaration, Mr. Riddick released any interest he may have acquired in the premises or the lease by reason of his designation as trustee and assigned any such interest to Wells.
41. (a) The lease on the facility, referred to as the Lee Street Parcel Post Annex, was due to expire on March 15, 1965. Prior thereto, the Post Office Department decided that an enlargement thereof, costing about $35,000 and utilizing a part of the vacant land plaintiff had purchased, would serve its purposes for the next five years. Accordingly, it commenced negotiations with plaintiff for a new lease with a rental based upon such an enlarged facility, the plans for the proposed enlargement being furnished to plaintiff on June 26, 1964.
(b) On August 7,1964, a conference of several hours was held between plaintiff and Mr. Riddick, who was then acting as plaintiff’s attorney on the matter, and Mr. Roy Ronke, a Post Office Department Real Estate Officer (who was located in Chattanooga, Tennessee), with respect to the proposed enlargement and lease. Plaintiff stated that the cost of the original building was $115,000 and that its current depreciated value was $94,316.38.[2] The cost of the new addition was estimated to be $35,000. The value of the land on which the facility then stood (Lots 158 and 159) was stated to be $30,000. The addition would utilize a 50-by-200-foot portion of the 80-by-200-foot Lot 157. Plaintiff had paid $17,500 for the lot, and he valued the 50-by-200-foot portion thereof that would be utilized as $12,500. On the basis of these asserted *358 values of the buildings and the utilized land ($171,816.38),[3] plaintiff asked for a rental of $30,000 for a 5-year lease. However, after extended discussion, he reduced the rental to $24,-000 per annum on a 5-year lease, with two renewal options at the same annual rental. The calculation was made on the following basis: The “Per annum rental value 10 year amortization at 6%” of the $129,316.38 value of the buildings ($94,316.38, the estimated depreciated value of the existing building, plus $35,000, the estimated cost of the new building) was $17,237.87.[4] The per annum rental value of the $42,500 cost of the land to be utilized ($30,000 for the land presently utilized plus $12,500 for the additional parcel), calculated at 6 percent of such total cost, was $2,550. Insurance per annum, and taxes, came to $544 and $3,680.40 respectively. The total of these amounts was $24,012.27, which was rounded off to $24,000.
(c) On the same day, plaintiff executed an Agreement to Lease Form 1400 in which he agreed to rent his premises, with the addition, for five years, commencing March 16, 1965, at $24,000 per 'annum, with two 5-year renewal options at the same per annum rental.
(d) By memorandum of August 20, 1964, to the Real Estate Branch of the Memphis Region, Mr. Ronke recommended that defendant enter into the lease on the aforementioned terms.
42. (a) After further negotiations, plaintiff, by a letter dated October 1,1964, modified his Agreement to Lease dated August 7,1964, by (a) reducing the rental on the two 5-year consecutive renewal options from $24,000 to $18,000 per an-num; and (b) providing that the lease term would commence from the first day of the month following the date the use of the improvements began or the date of the acceptance of the improvements, whichever was earlier, such date, how *359 ever, to be not later than March. 16, 1965. Plaintiff decided to enter into this lease at such figures against the ad-vice of another attorney he consulted who was also an officer of the bank which then held the mortgage on the property.
(b) On November 18, 1964, defendant, by Amos J. Coff-man, Deputy Assistant Postmaster General, accepted plaintiff’s Agreement to Lease dated August 7, 1964, as modified by plaintiff’s letter dated October 1, 1964. Plaintiff was notified of such acceptance by letter of November 23, 1964, from Mr. Mott, who was then the Chief of the Real Estate Branch at Memphis.
(c) Pursuant to the Agreement to Lease, as modified, plaintiff constructed the addition in accordance with plans and specifications approved by defendant.
43. (a) Under date of May 10,1965, plaintiff and defendant, by Amos J. Coffman, Deputy Assistant Postmaster General, entered into a lease of the Lee Street Parcel Post Annex, as enlarged. The lease was for a 5-year term, commencing March 16, 1965. Instead of the $24,000 rental as set forth in plaintiff’s Agreement to Lease, as modified, the lease provided for a rental of $20,319.60. The change resulted from subtracting the estimated $3,680.40 annual taxes on the land and building (finding 41 (b)) from the $24,000 rental figure previously agreed upon, and providing that defendant would pay such taxes. In addition, the lease provided for two 5-year renewals, at the option of defendant, at an annual rental of $14,319.60, which again was $3,680.40 less than the $18,000 per annum rental for the renewal option periods set forth in plaintiff’s modification letter of October 1, 1964.
(b) To finance the construction of the new addition to the facility, and to refinance the existing mortgage on the property, plaintiff obtained a mortgage from the Valley Fidelity Bank and Trust Company of Knoxville, Tennessee, the mortgage maturing on December 23,1976. On May 26,1965, plaintiff assigned to the bank all of the rents due under the lease and any renewal option exercised thereunder.
44. At various times thereafter, defendant, under authorization of Mr. Mott, made certain expenditures in connection with the facility, such as additional paving, in the amount of *360 $1,496, paid, on July 30,1965, to the Tennessee Asphalt Company,* $657.60 for the installation of certain wiring and electrical outlets, paid on October 1,1965, to the Parks Electric Service; $350 paid to plaintiff on November 30, 1965, to repair damage to the asphalt paving caused by defendant; and $347 for patching and painting walls, paid to the Reagan Company on March 7,1966.
45. The Memphis regional officials and the Knoxville Postmaster continued to recommend to Post Office Department headquarters in Washington, D.C., a still further expansion of the Lee Street Parcel Post Annex, and in 1968 the Department approved the recommendation. Thereupon, the Memphis Region undertook negotiations with plaintiff to obtain an agreement whereby plaintiff would construct and lease to the United States the authorized expansion of the postal facility on the remaining land which plaintiff owned adjacent to the existing facility. Plaintiff was not able to obtain the necessary financing for the additional construction unless the Post Office Department would agree to a 10-year lease. The proposed new addition would cost over $200,-(900. Considering the mortgage already on the property, which would have to be refinanced, a total new loan of over $350,000 would be required. It was not possible for him to «obtain such a bank loan unless the proposed lease would fully liquidate the loan over the lease period, with the lease to be assigned to the bank. However, the Department’s representatives stated that they had been authorized to negotiate for a ■5-year lease. Defendant’s officials were not interested in the :rental figure which plaintiff quoted on a 5-year lease basis which came to over $75,000 per annum (to liquidate the required loan of over $350,000) and which plaintiff was insisting should be high enough to pay for the extras when the original building was constructed in 1960 and for which plaintiff was still insisting he had never been paid. Accordingly, it was not financially possible for plaintiff to engage in the expansion plan desired by the Department upon the lease terms the Department desired. During these negotiations, plaintiff was represented by the Vice President of the Tennessee Valley Bank of Knoxville, who was also an attorney, such bank having in 1964 refinanced the original *361 mortgage on tlie property (the attorney being the same bank official who had advised plaintiff with respect to the second lease of 1965).
46. Since plaintiff and the Post Office Department could not agree upon the terms of a new lease which would cover the enlarged facility the Department desired, since such failure threatened the Department’s continued occupancy of plaintiff’s property after the expiration on March 15, 1970, of the then current 5-year lease, and also because of his then stringent financial condition, plaintiff decided to sell the property upon which the Parcel Post Annex, as enlarged in 1965, had been erected. On September 19,1968, plaintiff (and his wife) conveyed title to the facility and the land upon which it stood to the Lee Street Corporation of Knoxville, Tennessee, for $163,660 (which included an assumption of the mortgage on the property). Such conveyance covered Lots 158, 159, and 50 feet of Lot 157. On March 12, 1969, plaintiff (and his wife) sold to the Lee Street Corporation the remaining unimproved land adjacent to the then existing facility. This conveyance covered Lot 156 and the remainder of Lot 157. The purchase price for this conveyance was $47,000.
47. (a) After plaintiff sold the improved and unimproved land to the Lee Street Corporation, the Post Office Department obtained to agreement (Agreement to Lease Form 1400) from the Corporation to construct the expansion to the existing facility and to lease the entire facility to the United States for a term of five years at a rental of $56,358 per annum. The Agreement to Lease was dated December 12, 1968, and accepted by the Post Office Department on February 28,1969. The lease was to commence on the first day of the month following acceptance by defendant of the completed enlarged facility, at which time the current lease on the property would be canceled.
(b) Approximately a year later, the Lee Street Corporation, by a superseding Agreement to Lease dated December 9, 1969, as modified by its letter dated March 4,1970, the agreement, as modified, being accepted by defendant on March 10, 1970, agreed to lease the enlarged facility for ten years at a rental of $53,500 per annum. There was, in addition, certain *362 other changes, including an increase in the size of the enlarged facility’s platform from 6,050 square feet to 6,203 square feet, and an increase in the “parking and maneuvering” area from 34,050 square feet to 47,989 square feet. During the year, certain factors caused a change in the Department’s policy against entering into a lease for this facility in excess of five years. The most important was that, from the beginning, the facility was regarded as a temporary one, and the Department did not want to obligate itself to occupy it for terms in excess of five years. A new major postal facility was being planned for Knoxville at the time the first Agreement to Lease was entered into with the Lee Street Corporation. However, after the acceptance of such agreement by defendant on February 28, 1969, the plan for the construction of the permanent facility was deferred, making a 10-year lease for the temporary facility feasible. Furthermore, because of the rapid rise in interest rates that occurred in 1969, which increased the Corporation’s costs of financing the construction and ownership of the enlarged facility, the Corporation pressed for a longer term. Considering the situation as it existed in March 1970, the Department’s headquarters in Washington agreed to the 10-year lease term, at an annual rental figure which was, however, less than the figure specified in the first Agreement to Lease.
48. (a) Plaintiff contends that Post Office officials with' apparent authority ordered the Reagan Company or its subcontractors to incorporate the extras or to make the changes in the original building in 1959 and 1960, as hereinabove set forth (findings 18-23), by direct instructions to such contractors, and that such extras or changes were made without the knowledge or approval of plaintiff or Mr. Riddick. The record as a whole fails to support this contention.
(b) Plaintiff contends that the total cost of such extras or changes was $14,671.39. The record as a whole does not sustain this contention. There is no breakdown of this figure contained in the record, nor any satisfactory accounting or other data or evidence sufficient to support the accuracy or reasonableness thereof. Similarly, the record does not sustain plaintiff’s contention that the amount of the changes or *363 extras on the original building, plus interest thereon compounded annually at 6 percent, from 1960 through September 1968, equals $24,434.38.
(c) Plaintiff contends that he has not received any compensation for such extras or changes from the Post Office Department. In light of the figures upon which the second lease was based (finding 41), this contention is not sustained by the record.
(d) Plaintiff contends that his net loss on the additional land he purchased in 1960 (finding 32), considering the periods the parcels were not in fact utilized for the facility while he owned such property, was $40,987.29.[5] The evidence in the record is not sufficient to support the accuracy of this figure, nor is it sufficient to support any other figure.
(e) Plaintiff contends his total loss with respect to the facility here involved was $70,097.08, composed of the following figures:
$24,434.33, as set forth in paragraph (b) above 40,987.29, as set forth in paragraph (d) above 3,864. 09, constituting the total city taxes on the land he purchased but which he never used for the facility, plus interest compounded at 6% from 1960-1968
811. 37, constituting the total state and county taxes on such unused land, plus interest compounded at 6% from 1960-1968
$70,097.08
The record fails to support this contention.
*364 CONCLUSION OS' LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

 The lease gaye defendant two 2-year and one 1-year renewal options at 515,000 per annum.

 Transcript, pp. 231 — 36.

 In another instance of two proposed extras, defendant decided, in view of the price quotations which plaintiff’s agent submitted, to hold the construction of one item in abeyance, and to forgo mating the other, (finding 24)

 As a result, the exact nature of the extras or changes themselves, as well as the reasonable cost or value thereof, are insufficiently delineated. What the record does show as to the nature of the alleged extras or changes is set forth in findings 18-23. The first written claim presented for the extras was by letter of July 26, 1960, from plaintiff’s agent to the Regional Real Estate Manager. That letter claimed only $7,635.36 (finding 31(a)). The Manager, in response, requested “an itemized statement of the amount of the extras” and “the names of the postal officials who authorized the additional work.” (finding 31 (b)) The record contains no response setting forth the requested data.

 28 U.S.C. § § 2401, 2501 (1970).

 As to the extras, the response stated that the only extra the Bepartment had negotiated with plaintiff was for the docks and canopies, but that “should It be determined the pi'esent facility can be satisfactorily expanded,” plaintiff “may negotiate with the Department for what he feels is a more equitable rental.”

 At this time, plaintiff took over the negotiations himself, the property having by then all been reconveyed to him (and his wife), making him the owner of record. Plaintiff’s former trustee-agent now acted as plaintiff’s attoi'ney-adviser.

 With two 5-year renewal options at $18,000 per annum.

 Similarly, such assumption reduced the rental for the renewal option periods to $14,319.60.

 On this extras item plaintiff claims damages in the amount of $24,434.33, composed of $14,671.39 as the cost of the extras, plus $9,762.94 as interest thereon at 6 percent compounded annually from 1960 through Septenjber 1968, when he sold the facility.

 Tr., pp. 320-21.

 Including Interest of 6 percent on Rls Investment In such property compounded annually from 1960 through March 1969, when the balance of the property was finally sold.

 Included In such changes was an Increase In the size of the enlarged facility’s platform from 6,050 to 6,203 square feet, and a substantial Increase In the parking and maneuvering area from 34,050 to 47,889 square feet.

 At Transcript pages 86 and 156, Mr. Wells testified that Mr. Witherspoon ordered the wall. At page 133, however, he testified that it was Albert G. Mott, an employee in the Operations Division of the Regional Office, who ordered the wall to be built. Mr. Witherspoon retired in 1961 and was deceased at the time of the trial and Mr. Mott’s testimony does not indicate that he ordered the wall to be built. He was not even assigned to the Memphis Region at the time the facility here Involved was built.

 The $115,000 figure is in excess of the construction contract price of $88,973 with the Reagan Company, plus the $1,300 approved extra for the docks (which defendant paid for separately), plus the approximately $14,000 in extras which plaintiff is claiming. The record does not contain a satisfactory breakdown or explanation of this $115,000 figure.

 The calculation Is as follows:
Present building — estimated depreciated value_$94, 316. 38
New addition_ 35,000. 00
Land- 42,500.00
171, 816. 38

 $12,931.63 each year (one-tenth of $129,316.38) plus 6 percent Interest on the unamortlzed balances.

 Plaintiff calculates sucli figure on the basis of the following theory and figures claimed to be applicable: The cost of the vacant property purchased In 1960 was $57,613.40. Interest at 6 percent, compounded, from 1960 through March 1969, when plaintiff finally disposed of the property, comes to $37,921.29, mating a total Investment of $95,534.69. The cost of the additional land utilized in 1965, $11,473.44, is then subtracted from such “total investment,” thus reducing the total investment in the vacant land to $84,061.25. Plaintiff then subtracts from such remainder the original cost of the vacant property less the part used for the addition in 1965 ($46,139.96, i.e., $57,613.40— $11,473.44). In this fashion, plaintiff arrives at a total investment in the unused vacant property of $37,921.29 ($84,061.25 — $46,139.96). To this total investment, plaintiff then adds $3,066, being the difference between the cost of the original vacant land (less the part utilized in 1965) and the sales price he received for it in 1969 ($46,139.96 — $43,073.96=$3,066.00) to arrive at a “Net Loss Prom Sale of Vacant Land And Interest On Investment” figure of $40,987.29.